**EDUCATIONAL EQUALITY LEAGUE, et al., Appellants,**

**v.**

**Honorable James H. J. TATE, Mayor of the City of Philadelphia, and the Educational Nominating Panel.**

**No. 71-2042.**

United States Court of Appeals, Third Circuit.

Argued Dec. 5, 1972.

Decided Jan. 11, 1973.

As Amended Feb. 20, 1973.

Certiorari Granted May 7, 1973.
See 93 S.Ct. 2149.

Edwin D. Wolf, of Lawyers' Committee for Civil Rights, Philadelphia, Pa., for appellants.

Howard D. Scher, John Mattioni, Asst. City Sol., Levy Anderson, City Sol., Philadelphia, Pa., for appellees.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Plaintiffs instituted their class action under 42 U.S.C. § 1983 (1970) in August 1971 against the Honorable James H. J. Tate ("Mayor"), then May-

or of Philadelphia, and the Educational Nominating Panel ("Panel").[1] They alleged that the Panel had been appointed in a racially discriminatory manner. After considering the stipulated facts and the testimony and exhibits both sides introduced, the district court entered an order on November 8, 1971, dismissing the action.[2] From that order plaintiffs appeal. This court has reviewed the applicable law, which now includes two significant cases decided after the district court order,[3] and has concluded that it is compelled to vacate the district court order and to direct the district court to grant appropriate relief.[4]

The Educational Supplement of the Phildelphia Home Rule Charter (Educational Supplement) provides that the mayor appoint the members of the Board of Education. The function of the Panel is to submit to the mayor the names of persons best qualified to serve on the Board. The Panel nominates three persons for each place on the Board to be filled, and an additional three persons if the mayor requests such additional names. The mayor must choose solely from these nominees. See section 12–207(b) of Educational Supplement. The Panel, which has thirteen members, is itself chosen by the mayor. Nine members must be the highest ranking officers of specified types of city-wide organizations, and four are chosen at large.[5] Each Panel serves two years, commencing at or before May 25 of odd-numbered years.

The Chairman of the Educational Home Rule Charter Commission, which drafted the Educational Supplement, contemplated that the composition of the Panel would "constitute a balanced representation or cross-section of the people of the entire community—all of the community's ethnic, racial, economic, or geo-

---

1. Although defendants did not question the propriety of suing the Panel under § 1983, it would appear that the Panel is not a "person" under this section and thus not liable to such a suit. See United States ex rel. Gittlemacker v. County of Philadelphia, 413 F.2d 84 (3d Cir. 1969). Consequently, the district court was correct in dismissing plaintiffs' complaint as to the Panel.

2. The district court opinion in support of this order is reported at 333 F.Supp. 1202 (E.D.Pa.1971).

3. Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); and Smith v. Yeager, 465 F.2d 272 (3d Cir. 1972), cert. denied sub nom. New Jersey v. Smith, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972).

4. The dismissal in favor of the Panel, however, will be affirmed. See note 1, *supra*.

5. Section 12–206(a)–(b) provides:
   "(a) The Mayor shall appoint an Educational Nominating Panel consisting of thirteen (13) members. Members of the Panel shall be registered voters of the City and shall serve for terms of two years from the dates of their appointment.
   "(b) Nine members of the Educational Nominating Panel shall be the highest ranking officers of City-wide organizations or institutions which are, respectively:

"(1) a labor union council or other organization of unions of workers and employes organized and operated for the benefit of such workers and employes,
"(2) a council, chamber, or other organization established for the purpose of general improvement and benefit of commerce and industry,
"(3) a public school parent-teachers association,
"(4) a community organization of citizens established for the purpose of improvement of public education,
"(5) a federation, council, or other organization of non-partisan neighborhood or community associations,
"(6) a league, association, or other organization established for the purpose of improvement of human and intergroup relations,
"(7) a non-partisan committee, league, council, or other organization established for the purpose of improvement of governmental, political, social, or economic conditions,
"(8) a degree-granting institution of higher education whose principal educational facilities are located within Philadelphia, and
"(9) a council, association, or other organization dedicated to community planning of health and welfare services or of the physical resources and environment of the City."

graphic element and segments."[6] The rationale of the Panel-Mayor-Board arrangement was explained as follows:[7]

"Selection of the School Board is the key feature of the Charter Supplement. The concept is that the Mayor, as the Chief Executive of the City, elected by and accountable to the entire electorate and community, is the appropriate 'appointing authority' for the School Board. As such, the Mayor is permitted sufficient discretion in School Board selection to preserve such accountability. On the other hand, the Panel is a mechanism for dignified recruitment and screening of top-caliber candidates for the important community post of School Board member.

"The Panel would play a crucial role in selection. It would be constituted and composed in a manner that safeguards the Mayor's accountability, that produces representativeness of the entire community, and that assures responsiveness to community change and development over the years.

"The Panel would perform a governmental role in helping to select a School Board which administers the public school system and the public funds required to finance it. Therefore, it is proper to restrict Panel membership to residents of the City; yet, its composition will permit the Mayor to select members who are dedicated to the improvement of the larger regional community and whose perspective encompasses the statewide and national implications of the public education task.

"While the Mayor would be required to select nine members of the Panel from among the principal officers of City-wide organizations, he could select more or all thirteen members from such categories if he wish-

es. However, through the four at-large memberships, distinguished citizens would not be precluded from serving on the Panel merely because they are not officially identified with a particular community organization at a particular time.

"By specifying categories, rather than particular organizations, in the Charter, the Proposals recognize that community organizations and civic agencies change with time, and that over a period of years there can be wide representation of the many dedicated community groups and civic agencies in our City.

"The Supplement requires the Panel to solicit nominations from all community elements and agencies, study the qualifications of nominees, screen and select nominees, and make recommendations to the Mayor."

This legislative history serves as the background for the facts of which plaintiffs complain. The first Panel, appointed in 1965, had ten white and three black members. The white-black ratios of the 1967, 1969, and 1971 Panels were, respectively eleven and two, twelve and one, and eleven and two.[8] At the time the 1971 Panel was being appointed, blacks constituted about 33.5% of the population of Philadelphia and a much greater percentage, 60%, of the students in the public school system. A number of black-oriented organizations met the specifications of seven of the nine categories of section 12–206(b).

The Mayor not testifying, the only evidence relating to the inner workings of the Mayor's appointment machinery came from W. Wilson Goode, one of the plaintiffs, and from Deputy Mayor Anthony Zecca, the person responsible for recommending to the Mayor organizations which met the requirements of section 12–206(b). Although the district court made no finding on the subject,

6. Exhibit D–7, reproduced at App. 15a.

7. Suppl.App. 4a–5a.

8. Apparently the appointment of one of the two blacks on the 1971 Panel occurred because, after a qualifying city-wide organization had been selected but before its president could be appointed to the Panel, the white president was succeeded by a black.

Mr. Goode testified, without contradiction or objection, that shortly before the 1969 Panel was due to be appointed at a time when there was one vacancy for which the 1967 Panel had not yet made nominations, the Mayor stated that he would appoint no blacks to the Board of Education in addition to the two already on it.[9] Mr. Goode also accused the Mayor of not reappointing to the 1969 Panel organizations which served on the 1967 Panel because of dissatisfaction with the 1967 Panel's having included so many blacks among its nominees.[10]

Deputy Mayor Zecca testified that he had no knowledge of the use of racial criteria in the appointment process,[11] but was unable to recall why the 1967–1969 changes had been made.[12] The district court found that Deputy Mayor Zecca was unaware of the existence of black-oriented organizations which were within the requirements of section 12–206(b).[13]

Assessing all the evidence, the district court ruled that the reasoning of Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), where the Supreme Court held that plaintiffs had established a prima facie case of discrimination, did not apply to the present situation. Nevertheless, the court examined this situation as if Turner v. Fouche were controlling and concluded that on these facts plaintiffs had not made out a prima facie case. The low percentage of blacks on the Panel was meaningless, the court decided, because the Panel's small size invalidated comparisons between the racial composition of its membership and that of the population of Philadelphia. The court also rejected as unpersuasive various statistics regarding the Mayor's record in appointing blacks to other positions in the city government.[14]

Having thus found no indirect evidence of discrimination, the district court went on to hold that plaintiffs had not established a direct case of discrimination, either, overlooking Mr. Goode's testimony about the Mayor's statement referred to earlier in this opinion.[15] The court apparently concluded that the Deputy Mayor's ignorance of black-oriented organizations did not amount to discrimination against blacks.

■■ It should be noted at the outset that plaintiffs are not seeking to establish any sort of racial quota for membership on the Panel. No group can demand "as a matter of substantive constitutional right, any particular degree of racial balance or mixing. . . ." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

---

9. N.T. 14–17 of Document 14 (E.D.Pa., Civil No. 71–1938). If the Mayor decided, prior to receiving nominees from the Panel to exclude black nominees from consideration, an inference may be drawn that the Mayor in similar manner excluded blacks from consideration as members of the 1971 Panel.

10. *Id.*

11. N.T. 212.

12. N.T. 222.

13. See Finding of Fact 17 at p. 1204 of 333 F.Supp. For example, Deputy Mayor Zecca apparently thought that only the AFL–CIO and the Greater Philadelphia Chamber of Commerce fit the specifications, respectively, of section 12–206 (b)(1) and (2). *See* N.T. 248–52. According to the testimony of Mr. Goode, the United Negro Trade Unions would qualify under section 12–206(b)–(1) and both the Greater Philadelphia Community Development Corporation and the Greater Phila-

delphia Enterprise Development Corporation, among others, under section 12–206 (b)(2). N.T. 4–5 of Document 14 (E.D. Pa., Civil No. 71–1938). The highest ranking officers of these three organizations are black.

Despite Deputy Mayor Zecca's good faith, his failure to familiarize himself with these eligible organizations would, given his important position in the selection process, support an inference that the selection process had a discriminatory effect.

14. Because of our conclusion, it is unnecessary to discuss whether the district court erred in evaluating these sets of data.

15. In view of the result reached on plaintiffs' federal claims, the district court declined to exercise pendent jurisdiction over plaintiffs' claim that the Mayor had also violated state law—namely, various provisions of the Educational Supplement —in selecting Panel members.

Plaintiffs ask only that the Mayor of Philadelphia not exclude blacks from proper consideration when making appointments to the Panel. Almost a century ago the Supreme Court articulated the rationale of the Fourteenth Amendment: [16]

"It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,—the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps toward reducing them to the condition of a subject race."

Such is still the law. As the Supreme Court said in Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970), "the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications."

■ Defendants attempt to distinguish Turner v. Fouche on two grounds. First, they suggest that it was significant in Turner v. Fouche that the instrument for selecting the members of the School Board was a grand jury, which grand jury was alleged to have been chosen in a discriminatory manner. In other words, defendants argue that the Fourteenth Amendment applies more forcefully to grand juries than to some other public body such as the Panel here, even though the Panel plays a role in the Philadelphia school system analogous to the grand jury in Turner v. Fouche. The answer to this argument is that there is no place for discrimination anywhere in the public school system. *See* Brown v. Board of Education, 347 U.S. 483, 493–495, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Secondly, defendants reason that a member of the executive must have considerable discretion in the choice of his personal staff and that the Fourteenth Amendment should not be interpreted to restrain the exercise of this discretion. It is unnecessary for this court to decide whether the Fourteenth Amendment is limited in this way, because it is clear from the language of the Educational Supplement and from the legislative history quoted earlier that the Panel was not intended to operate as part of the staff of the Mayor.

Having determined that discrimination in the appointment of the Panel was impermissible, we turn to the question of whether the plaintiffs succeeded in proving that there in fact was discrimination against blacks.

In holding in favor of the plaintiffs in Turner v. Fouche, the Supreme Court relied on three factors: the substantial difference between the proportion of blacks on the list from which the grand jury was chosen (37%) and in the general population (60%); the elimination of 171 blacks out of the 178 persons found to lack "intelligence" or "uprightness;" and the failure of the jury commissioners to familiarize themselves with the black community. In Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972), the Court pointed out that the various steps taken in the selection process resulted in the "progressive decimation of potential Negro grand jurors" and that

---

16. Strauder v. West Virginia, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880).

"[t]he racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination." This court recently reviewed Turner v. Fouche and Alexander v. Louisiana and held that to prevail a plaintiff need not show a deliberate practice of discrimination; a prima facie case is established by a demonstration that blacks were under-represented and that there was an opportunity for racial discrimination. Smith v. Yeager, 465 F.2d 272, 278–279 (3d Cir. 1972), cert. denied sub nom. New Jersey v. Smith, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972). We also found that ignorance on the part of a jury commissioner had considerable importance. Id. at 277.

In the present case the opportunity for discrimination cannot be denied. Unfortunately, the parties did not introduce the expert testimony of a statistician on whether the frequency of black appointments to the 13-member Panel fell outside the range to be expected were race not a factor. However, the small proportion of blacks on the Panel is significant in light of the racial composition of the public schools, which are about 60% black. Because one qualification for Panel membership is interest in the public school system and because the parents of school children are likely to have this interest, a colorblind method of selection might be expected to produce that many more black Panel members. Thus, properly considered, the small proportion of blacks on the Panel points toward the possibility of discrimination. This implication is consistent with the inferences to be drawn from the testimony on the Mayor's Panel and Board selection processes.[16a]

We have carefully gone over the record and have concluded that it made out a prima facie case of discrimination under the above-cited cases. Although on notice of the potential need to present evidence to rebut such prima facie case evidence,[17] defendants did not offer any reasonable explanations. The only testimony relevant to such explanations was that of Deputy Mayor Zecca,[18] and "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972); see also Turner v. Fouche, supra, 396 U.S. at 361, 90 S. Ct. 532; Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).[19] Accordingly, the defendants failed on this record to rebut the prima facie case as a matter of law.

It will be the district court's function to determine the precise nature of the relief to which plaintiffs are entitled. Plaintiffs have limited their complaints to the method of selection of Panel members; they do not challenge the operation of the panel, insofar as it resulted in appointments to the Board made prior to the filing of this civil action in August 1971.[20] Consequently, we hold that the district court should issue a declaration that the selection of the

---

16a. See notes 9 and 13 above.

17. See N.T. 106–08, 111–13.

18. The distinguished members of the Panel testified as to its operation. There was nothing in the record to suggest any impropriety whatsoever on their part. However, the question at issue is how they were appointed, not how they conducted themselves.

19. In the Burton case, supra, the Court used this language at page 725, 81 S.Ct. at page 861:

". . . [N]o State may effectively abdicate its responsibilities [under the Fourteenth Amendment] by either ignoring them or by merely failing to discharge them whatever the motive may be. It is of no consolation to an individual denied the equal protection of the laws that it was done in good faith."

20. See N.T. 265–66. Counsel for plaintiffs conceded at N.T. 266 that this case is not concerned "with the composition of the School Board" in August 1971. On remand, the district court should consider the continuing effectiveness of appointments to the Board made after August 1971 on the basis of all the facts which may be developed at the hearing on such remand. Past nominations which have not been confirmed through appointment to the Board by the Mayor will be ineffective.

members of the 1971 Panel has violated the Fourteenth Amendment and an injunction restraining the Mayor and his successors from considering any nominees for the Board submitted by such Panel. Because of the nearness of the expiration of the 1971 Panel's term of office, it may be unnecessary to have its members replaced via a proper selection process. However, the district court should enjoin the present Mayor from discriminating in regard to the 1973 or future Panels and should require that before the 1973 Panel is selected, the Mayor or his staff submit to the court evidence that organizations in the black community which qualify for the various categories of section 12–206(b) of the Educational Supplement have received proper consideration.[21]

The district court's order dismissing plaintiff's complaint will be vacated, except as to the Educational Nominating Panel, and the case remanded to the district court for further proceedings consistent with this opinion.

21. Mayor Tate has been succeeded by the Honorable Frank Rizzo and the present case has, of course, involved no showing that Mayor Rizzo has in any way discriminated against blacks. Nevertheless, on this record, Mr. Zecca continues as a Deputy Mayor and since this court finds that plaintiffs have shown on this record discrimination in regard to the present Panel, the federal courts must assure that the appointment of the 1973 Panel is free from taint. *Cf.* Conover v. Montemuro (3d Cir. No. 71–1871, at p. 13 of slip opinion of 12/20/72). Also, we repeat that the defendant Mayor never testified and the court passes no personal judgment on him, but it is required to act on the basis of the record before it.