**ERIE HUMAN RELATIONS COMMIS-SION et al., Appellees,**

v.

**Hon. Louis J. TULLIO, Mayor of the City of Erie, et al., Appellants.**

No. 73–1707.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1974.

Decided March 4, 1974.

See also, D.C., 360 F.Supp. 628.

Lawrence L. Kinter, Erie, Pa., for appellants.

Norman J. Watkins, Deputy Atty. Gen., Harrisburg, Pa., argued for the appellees.

Michael Louik, Robert P. Vogel, Asst. Attys. Gen., Israel Packel, Atty. Gen., for Commonwealth of Pennsylvania as amicus curiae.

Henry W. Sawyer, III, Amy F. Davis, Philadelphia, Pa., for amicus curiae American Civil Liberties Union.

Before ADAMS, HUNTER and WEIS, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is an appeal in an action brought by the Erie Human Relations Commission and four individual blacks in which it was alleged that the hiring procedures used to staff the Erie, Pennsylvania Police Department discriminate against blacks, in violation of the Civil Rights Act, 42 U.S.C. §§ 1981, 1983 (1970), and the equal protection clause. The district court found in favor of the plaintiffs on the merits and ordered the imposition of a limited racial hiring quota. The appellants, various officials of the City of Erie, do not appeal the finding of discrimination, but they do challenge the propriety of this relief. In addition, they contend that the plaintiff Erie Human Relations Commission lacks standing to sue. We agree with the appellants on the standing issue but conclude that their attack on the district court's affirmative order lacks merit.

This suit was filed on March 22, 1973 and was accompanied by a Motion for a Temporary Restraining Order that sought, *inter alia,* to enjoin the defendants from administering a police civil service "mental" examination scheduled to be given on March 24, 1973. The motion was granted and a Temporary Restraining Order was issued on March 23, 1973.

The parties thereupon entered into negotiations that resulted in a stipulation which permitted the City to proceed with the mental examination on April 21, 1973. In return, the defendants agreed to make numerous changes in the requirements that must be met in order to be eligible to take the police mental examination (these preliminary requirements are hereinafter referred to as "pre-exam requirements").[1] In addition, the City agreed that:

"[u]pon verification by the federal Equal Employment Opportunity Commission that there exists a mental examination for applicants for the position of police officer, which has been validated both as to job-relatedness and to the exclusion of cultural bias, the Civil Service Board will substitute that examination for the one presently in use."[2]

Finally, the parties agreed to submit to the district court the question of what affirmative relief, if any, should be granted with respect to the hiring of black police officers.

In considering the question of affirmative relief, the district court adopted as its findings the factual assertions that were made a part of the stipulation. As a result, the record upon which the judgment is based contains the following agreed upon facts:

"1) The Erie Police Department (hereinafter "E.P.D.") presently consists of 214 officers, 3 of whom are black.

"2) During the period 1962–1972, 2 black officers were hired as police officers for the E.P.D.

"3) During the period 1952–1972, 7 black officers were hired as police officers for the E.P.D.

"4) 6.8% of the residents of the City of Erie, Pennsylvania (hereinafter "City") are black.

1. The changes were designed to eliminate allegedly discriminatory effects.

2. We note that the defendants also agreed to reduce the minimum passing rate on the mental examination from 70% to 60%. Stipulation, ¶ 9.

"5) 1.4% of the officers of the E.P.D. are black.

\* \* \* \* \* \*

"7) Any discrimination based upon the above-mentioned disparity and statistics is not the result of any intentional discrimination on the part of the City or any of the named defendants.

\* \* \* \* \* \*

"12) The mental examination given to applicants is, and has been validated, as job-related.

"13) The mental examination given to applicants has not been validated with respect to cultural bias which may or may not exist in said examination.

\* \* \* \* \* \* "

The district court determined that these facts established "as a matter of law that a pattern of racial discrimination has existed for a considerable period of time in the selection of officers of the Police Department of the City of Erie."

The court went on to conclude that, since the changes in the pre-exam requirements provided only a partial cure for this pattern of discrimination, affirmative relief was necessary. It therefore imposed a special racial quota upon the hiring procedures to be employed in filling the 20 positions presently open on the police force.[3] The court's order reads as follows:

". . . Defendants shall, in filling the next twenty positions . . . nominate to the appointing authority a sufficient number of candidates of the black race from the existing eligibility lists prepared pursuant to examinations administered in April 1973 to provide for the appointment of one black race candidate for every candidate of the white race so appointed until not less than ten black candidates have been so appointed unless the list of eligible black candidates is sooner exhausted. . . ."

The appellants raise two contentions with regard to the propriety of this order. Their first claim is that a racial hiring quota can only be ordered by a court if the facts of the case establish either 1) that there is a history of intentional racial discrimination or 2) that the testing and other pre-hiring procedures which exclude minority group members are not job-related. In the present case, they argue, the facts do not establish either of these conditions (and in fact establish the opposite). As a result, they conclude that the racial hiring quota that was ordered is impermissible.

■ This contention is faulty in two respects. First, even if we were to agree that racial quotas are barred in situations where there is no intentional discrimination and where the pre-hiring procedures are job-related, this rule would have no application here. The appellants contend that the stipulation establishes job-relatedness when it states that "[t]he mental examination . . . has been validated as, job-related." However, since the "mental examination" is only one part of the City's pre-hiring procedure, this statement by itself cannot fully establish that all of the criteria used to evaluate those interested in becoming police officers were job-related. In fact, the stipulation (which constitutes all findings of facts in the case) is entirely silent on whether the various "pre-exam requirements," in effect when they created the pool of applicants who took the April 21, 1973 mental examination, were job-related.

■■ The absence of findings on this question is fatal to the appellants' claim. Since the appellees' evidence clearly established a prima facie case of discrimination,[4] the burden shifted to the appel-

---

3. These 20 additional positions were apparently made possible by virtue of a special state grant. See Erie Human Relations Commission v. Tullio, 360 F.Supp. 628 (W.D.Pa., filed July 12, 1973).

4. "[A] prima facie case is established by a demonstration that blacks were under-represented and that there was an opportunity for racial discrimination." Educational Equality League v. Tate, 472 F.2d 612, 618 (3d Cir. 1973); Smith v. Yeager, 465 F.2d 272, 279 (3d Cir. 1972), cert. denied 409

lants to justify their pre-hiring procedures in order to avoid a finding of discrimination. Educational Equality League v. Tate, 472 F.2d 612, 616 (3d Cir. 1973); Bridgeport Guardians, Inc. v. Civil Service Comm'n, 482 F.2d 1333, 1337 (2d Cir. 1973); Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972).

We do not believe that the appellants' burden of proof is any lighter here where they concede that discrimination exists (as they do in this appeal) but seek to invoke the job-relatedness of their pre-hiring procedures to avoid the imposition of a particular equitable remedy. Thus, since the record is silent on whether the pre-exam requirements used are job-related, the appellants have failed to establish a necessary element of their own rule, and they cannot invoke it to avoid imposition of the racial quota ordered by the district court.[5]

Moreover, we believe that this contention is faulty in a second and more basic respect as well. The rule they seek to establish would, in effect, limit, as a matter of law a district court's discretion in formulating equitable relief. We believe that such a per se limitation would be unwise absent a compelling demonstration of its necessity. As the Supreme Court has said:

"The framing of decrees should take place in the District rather than in the Appellate Courts. They are invested with large discretion to model their judgments to fit the exigencies of the particular case." Int'l Salt Co. v.

United States, 332 U.S. 392, 400–411, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

■ We do not feel such a compelling demonstration has been made here, and indeed believe that the arguments against appellants' proposed rule predominate. Since many factors must go into a district court's judgment as to the form of equitable relief, a rule that would make two factors—intent and job-relatedness— determinative would appear to limit the district court in a rather arbitrary way. We do not believe this is desirable. On the contrary, preservation of the court's flexibility in the framing of remedies would seem to be particularly important in racial discrimination cases since they often require the district court to tailor its order to meet the needs of a highly complex and emotionally charged factual situation. As a result, we must reject the appellants' first claim on this basis as well.

Appellants' second contention with regard to the affirmative relief ordered is that the one black for one white (or 50%) ratio imposed is too high and constitutes an abuse of discretion by the district court. We reject this contention as well. The ratio here established is entirely reasonable when viewed within the context of the facts of the case and the limited scope of the total order. The quota imposed can only affect the next 20 positions filled, and will affect those positions only if 10 qualified blacks are available for appointment.[6] Moreover, even if all 10 "black" positions are

U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972). In this case under-representation was established by the disparity between the percentage of blacks on the force and the percentage of blacks in Erie's total population. The opportunity for discrimination was created by the necessity for making subjective judgments in applying several of the pre-exam requirements that were amended by the stipulation.

5. We note in passing that the "pre-exam requirements" which were used to select the pool of applicants who took the April, 1973 examination have now been substantially altered by agreement of the parties. Thus, while there are no findings of fact on this point, common sense would suggest that they were altered because they had a discrimina-

tory effect, and that therefore they were not, in fact, job-related. However, this line of reasoning involves a series of inferences based on evidences in the record. Since this process is more properly performed by the district court, we do not rely upon it as the basis for our decision.

6. In this latter respect, the present order differs significantly from the order reviewed in Commonwealth of Pennsylvania v. O'Neill, 473 F.2d 1029 (3d Cir. 1973) (aff'd by an evenly divided court en banc). Since in this case the order clearly requires that all blacks appointed under the quota be qualified, the most serious concern of the dissenting judges in O'Neill is not present here.

filled, it will only bring the percentage of blacks on the force up to 5.5%, a figure still somewhat below their 6.8% representation in the total population of Erie.

Finally, we note that the quota was designed to take advantage of the unique opportunity presented by the creation of 20 new police positions through a special state grant. We cannot say that the district court abused its discretion in using this grant as a vehicle to expedite the removal of the effects of the discrimination found here. Indeed, given the sensitive and highly visible role played by the police in maintaining racial peace and harmony, we feel that we should commend the district court since its order acts decisively and yet at the same time is carefully limited so that its adverse impact on others is minimized. Imposition of a 50% quota limited to the next 20 positions is not reversible error in these circumstances.[7]

■■ Appellants' last contention— that the district court erred in refusing to dismiss the Erie Human Relations Commission as a plaintiff for lack of standing—is meritorious.[8] As the recent discussion of the subject by this court in Schiaffo v. Helstoski, 492 F.2d 413 (3d Cir., filed Jan. 4, 1974) makes clear, to have standing a party must allege, at a minimum, a personal stake in the outcome of the action. In this case, the Erie Human Relations Commission has made no such allegation either for itself as a body or for its individual members. Instead, it seeks to bring this suit in its own name but on behalf of what it terms its "black clientele." Brief for Appellees at 5. This is improper. A party with no personal stake in the outcome of a case cannot establish standing to sue in federal court by alleging a concern for the rights of others, even if it is a body created by local ordinance for the express purpose of protecting those rights.

The order of the district court will be remanded with directions that it dismiss the Erie Human Relations Commission as a party plaintiff. In all other respects the order of the district court will be affirmed.

ADAMS, Circuit Judge (concurring):

Inasmuch as there was a finding of racial discrimination in the selection of police officers by public officials in Erie and the district court restricted the mandated hiring procedure to persons qualified to act as police officers, I agree with the majority that the district court did not abuse its equitable discretion in ordering the city officials to hire one black person for any white person hired until the twenty new police positions created by a specially financed program are filled.

7. Before concluding our discussion of the claims raised with regard to the relief ordered, we should note that while constitutional objections to the imposition of remedial quotas based on race have been raised in other cases, see, e. g., Porcelli v. Titus, 431 F.2d 1254 (3d Cir. 1970); Bridgeport Guardians, Inc. v. Civil Service Comm'n, 482 F.2d 1333 (2d Cir. 1973); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1972) (en banc); DeFunis v. Odegaard, 82 Wash.2d 11, 507 P.2d 1169 (1973), cert. granted, 414 U.S. 1038, 94 S.Ct. 538, 38 L.Ed.2d 329 (1973), no such contention appears to be raised here. However, even if it could be argued that constitutional contentions are implicit in the appellants' brief, the bulk of the cases that have dealt with these considerations both in this circuit, Porcelli v. Titus, supra; Contractors Ass'n v. Secretary of Labor, 442 F.2d 159 (3d Cir. 1971); Commonwealth of Pennsylvania v. Sebastian, 368 F.Supp. 854

(W.D.Pa., filed Dec. 1, 1972) (unreported), aff'd by judgment order, 480 F.2d 917 (3d Cir. filed June 7, 1973), and elsewhere, see, e. g., Bridgeport Guardians, Inc. v. Civil Service Comm'n, supra; Carter v. Gallagher, supra; DeFunis v. Odegaard, supra, have upheld the constitutionality of the use of quotas to eliminate the effects of discrimination. Since the disparity between blacks on the police force (1.4%) and blacks in Erie (6.8%) indicates that serious discriminatory effects are present here, this precedent would appear to be controlling on the question in any event.

8. At the same time, we reject the appellees' contention that the issue is moot. Since the affirmative relief ordered by the court has not yet been put into effect, the right of the Erie Human Relations Commission to compel proper implementation in a future proceeding before the district court turns on a determination of this issue.

However, I would reverse the district court's failure to dismiss the Erie Human Relations Commission as a party for a different reason than that set forth by the majority. Rule 17(b) of the Federal Rules of Civil Procedure provides, in part, that "[t]he capacity of a corporation to sue . . . shall be determined by the law under which it was organized" and that "[i]n all other cases capacity to sue . . . shall be determined by the law of the state in which the district court is held, except . . . that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue . . . in its common name for the purpose of enforcing . . . a substantive right existing under the Constitution or laws of the United States. . . ."

Before dealing with the intricate matrix of rules relating to the standing of representative plaintiffs, it would seem appropriate to inquire whether the Commission has the capacity, pursuant to "the law under which it was organized," to bring this suit. For if the Commission is without such capacity, the need to determine its standing to sue is foreclosed.

The Commission was established by city ordinance, and the enforcement section of the ordinance does not authorize the Commission to bring suit, but rather to refer the initiation of suit to the City Solicitor.[1] If, however, a city agency like the Commission is to be treated like "a partnership or other unincorporated association" for the purposes of Rule 17(b), the absence of statutory authorization would not be dispositive. It would appear from the background of Rule 17(b) that the relaxation of the requirement that an organization have "capacity [under state law] to sue" was designed to permit private entities that are well-established representatives of groups of people with common social and economic concerns to sue or be sued.[2] There is no indication that Rule 17(b) was intended to diminish a city's power to control, in furtherance of municipal policy, resort to the courts by its subdivisions and agencies,[3] as distinguished from permitting a city to designate its Solicitor to bring such suits.

I would, therefore, reverse the district court's failure to dismiss the Erie Human Relations Commission without reaching the question of the Commission's standing to sue as a representative plaintiff.

Since individuals alleging that discrimination impairs their ability to secure positions with the Erie Police Department have joined with the Commission as individual plaintiffs in this action, dismissal of the Commission as a party would not affect the substantive outcome of this appeal.

1. 151.09 Enforcement
(a) On and after September 1, 1963, in the event any person refuses or fails to comply with any cease and desist order issued by the Commission, for a period of ten days from the service of the order by registered mail or personally, the Commission shall certify the case and the entire record of its proceedings to the City Solicitor who shall invoke the aid of an appropriate court to impose the penalties provided in Section 151.99 and by appropriate action secure enforcement of the order.

(b) Whenever the Commission finds that any official, agent or employee of the city, or any contractor or subcontractor doing work for the city, has engaged in any discriminatory practice, it shall make a report thereof to the Mayor and Council.

2. *See* United Mine Workers v. Coronado, 259 U.S. 344, 385–392, 42 S.Ct. 570, 66 L.Ed. 975; Hart & Wechsler, The Federal Courts and the Federal System 1123–24 (2d ed. 1973).

3. *Cf.* Gates v. Council of City of Huntington, 93 F.Supp. 757 (S.D.W.Va.1950).