**COMMONWEALTH OF PENNSYLVA-NIA, Guardians of Greater Pittsburgh, Inc. NAACP, NOW, et al., Plaintiffs,**

v.

**Peter F. FLAHERTY, Mayor, etc., et al., Defendants,**

and

**F.O.P., Fort Pitt Lodge No. 1, Intervening Defendant.**

**Civ. A. No. 75–162.**

United States District Court,
W. D. Pennsylvania.

Dec. 5, 1975.

Michael Louik, Edward J. Abes, Clencie L. Cotton, Patricia Connell, R. Stanton Wettick, Jr., Samuel A. Vitaro, Pittsburgh, Pa., for plaintiffs.

Mead J. Mulvihill, Jr., City Sol., Daniel M. Curtin, Robert B. Smith, Asst.

City Sols., Pittsburgh, Pa., for all defendants.

A. Bryan Campbell, Pittsburgh, Pa., for intervening defendant.

## OPINION AND FINDINGS

WEBER, District Judge.

This action has been instituted by a congeries of parties plaintiff, both individuals and organizations, and defendants have moved to dismiss as to many of them. Also the plaintiffs bring the action as a class action as to certain enumerated classes. We find it unnecessary to determine these matters at the present stage because we believe that we have one proper party plaintiff sufficient to all these purposes, the Commonwealth of Pennsylvania.

The Commonwealth brings this action on behalf of all citizens of the Commonwealth, including the named plaintiffs. We find that the Commonwealth is a proper party plaintiff and has standing to bring this action on behalf of all citizens of the Commonwealth to redress racially discriminatory employment practices. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 [1972]; *Commonwealth of Pennsylvania et al. v. Glickman*, 370 F. Supp. 724 [W.D.Pa.1974].

Defendants are the Mayor of the City of Pittsburgh, the Police Superintendent, the members of the Civil Service Commission, its Secretary and Chief Examiner, all of whom are alleged to be responsible in their official capacities for the recruitment, qualification, selection, appointment and supervision of police officers and the Bureau of Police of the City of Pittsburgh. These individual defendants are charged, in their respective official capacities, as acting under color of law. The City of Pittsburgh as a municipal corporation is also named defendant.

Jurisdiction is claimed under 28 U.S. C. 1331, 1343(3) and (4). We find that the court has jurisdiction over the matter.

The complaint alleged discrimination in the hiring, appointment, promotion, and working conditions of black and female applicants and officers in the Bureau of Police of the City of Pittsburgh.

At this stage of the proceedings we are only concerned with the hiring procedure for applicants for appointment as police officers. The City of Pittsburgh and the defendant officers have administered a written examination and now propose to proceed to the appointment of 44 officers utilizing the usual civil service procedures including the "Rule of 3" as set forth in the Pennsylvania Civil Service Code, 53 P.S. § 23446, which provides for the submission in order of rank on the written examination (including Veterans' Preference). A preliminary injunction has been sought to enjoin this procedure and seek such other equitable relief solely with respect to the issue of the hiring and appointment practice. An extensive stipulation of facts has been filed and the court has heard additional evidence with respect to this issue.

## FINDINGS WITH RESPECT TO REPRESENTATION BY RACE AND SEX

1. The proportion of black persons in the population of the City of Pittsburgh in recent years is as follows:

| | |
|---|---|
| 1970 | 20% |
| 1960 | 17% |
| 1950 | 12% |

2. The proportion of black persons in the labor force of the City of Pittsburgh in recent years is as follows:

| | |
|---|---|
| 1974 | 17% |
| 1970 | 17% |
| 1960 | 15% |

3. The proportion of black persons on the police force of the City of Pittsburgh for recent years for which such information is available is as follows:

| | | | |
|---|---|---|---|
| June 6, 1975 | 84 | (5.9%) | out of a total of 1431 |
| Nov. 7, 1973 | 99 | (6.4%) | out of a total of 1549 |

Thus of a total decrease of police officers of 133 in the last 18 months 11.3% were black officers, or double the ratio of black officers on the whole force.

4. From February 10, 1969 to the present the police officers hired by the City of Pittsburgh were distributed by race as follows:

```
Feb. 10, 1969 1 (2.3%) black out of 43
July 28, 1969 2 (4.2%) black out of 48
Sept. 22, 1969 4 (8.7%) black out of 46
Jan. 12, 1970 2 (5.4%) black out of 37
Oct. 26, 1970 0 blacks out of 38
```

Thus of 212 new police officers added since February 10, 1969, 9, or 4.2% were black. None of these appointees were female.

5. By age the black persons on the police force are more heavily concentrated among the older officers nearer the retirement qualifications. Only 21 of the 84 black officers are age 40 or under, while 529 of 1,347 white officers are age 40 or under.

6. The ratio of blacks to whites has been declining in the past two years and the ratio of blacks will decline in the future more rapidly because a higher proportion of blacks are older and nearer the retirement age.

7. The ratio of women on the police force to men is now 12 (.8%) out of 1,431. This includes those classified as "matrons". No woman has been appointed since 1966 and that woman is now 45 years of age and is the lowest woman on the seniority list.

8. The labor force for the City of Pittsburgh in 1974 was 213,000 persons of whom 84,000 or 40% were women. In 1970 the labor force was 204,000 persons of whom 81,000 or 40% were women. In 1960 the labor force was 242,000 persons of whom 81,000 or 34% were women.

9. Of a total of applicants to take the police examination in 1975 of 3,299, 1,176 or 35.6% were women. Of a total of 1,949 persons passing the test, 751 or 39% were women.

THE DISCRIMINATORY EFFECT OF THE SELECTION PROCESS:

The marked difference between the population ratios, the labor force ratios, and the applicant ratios as divided between white and black applicants, and the make-up of the Pittsburgh Bureau of Police as similarly divided demonstrates a "racially disproportionate impact" of the method of selection. In the past there were many factors that may have caused this impact, such as an unwarranted formal educational requirement, disqualification for records of arrest or minor criminal convictions, or an attitude of blacks that police employment was not readily available to them, as evidenced by testimony that between 1959 and 1971 the number of black applicants for police appointments was significantly less than the proportion of blacks in the labor force.

We find that the Civil Service Commission in 1975 undertook an intensive recruitment campaign to encourage blacks and women to apply for a position as police officer. This was not only a highly commendable effort but it resulted in a ratio of 27.5% minority group (most black) applicants.[1] This exceeds the ratio of blacks in the general population.

For many years the Civil Service Commission has administered a written test as part of the qualification for appointment of its police officers. Prior to 1970 there is no record to indicate if any of these written examinations were validated by any standards respecting job-relatedness. The Equal Employment

1. In our discussion of applicants and examinees we include a small number of non-black minority males among the black statistics. 4 out of 434 blacks scoring a passing grade were non-black minority. Also 6 persons scoring a passing grade are not identified by race or sex.

Opportunity Commission Regulations requiring such validation were not adopted until 1970. No police civil service examinations have been administered in Pittsburgh since 1970 until the present examination in 1975. There are no statistics of race of prior candidates for examination.

The 1975 written examination administered to police officer candidates was based on the International Personnel Management Association's Police Officer Examination. This test was revised to make it more appropriate to Pittsburgh by professional testing consultants hired by the Civil Service Commission, who also devised their own reading comprehension segment of the examination. These consultants have approved the examination for content validity. Predictive validation of the test as administered must await actual experience in the performance of police duties by those appointed under it.

Nevertheless, it is stipulated between the parties, and the court finds, that the written test administered on April 21, 1975 was as good a test as any available to measure job-related areas of the entry level position of police officer.

The Civil Service Commission has determined that it will not administer any physical performance test for the 1975 candidates who passed the written examination.

A medical examination will be administered to all candidates eligible for appointment to the police academy to consist of physical and psychological examination, including two written psychological tests, a personal interview and evaluation. This will be non-competitive and does not affect the candidates' ranking on the eligible list.

█ Thus the only standard for appointment to the police academy is the mark achieved on the written test. Height, weight and physical agility or performance tests have been omitted because of the complaint of female applicants. We do not agree with the rationale of these decisions because we have a strong feeling that physical size, strength and agility are important elements to consider in the selection of one who is to be a guardian of the public safety. See *Smith v. Troyan*, 520 F.2d 492 [6th Cir. 1975]. We think physical fitness and agility tests may be required if properly related to job performance requirements, and we believe that these may be equally as valid a measure of ability to perform the critical functions of a police officer as any written test.

While we have statistical data on the racial composition of the Pittsburgh Police Bureau at various years up to the present, we have no statistics on the racial make-up of examinees until the 1975 exam.

With respect to the male examinees the state veterans' preference law granting a ten point bonus to veterans on the written exam has no noticeable impact. 31% of the white males and 34% of the black males received the additional 10 points because of veteran status. Among the males taking the test, without veterans' preference, 1 black male candidate ranked among the highest 22 males and 7 black males ranked among the highest 133. With veterans' preference, 1 black male ranked among the highest 12 males; and 10 black males ranked among the highest 108. (The impact of veterans' preference on the female applicants as compared to the males was severely adverse; only 8 females out of 866 taking the test were entitled to this bonus. As a result, only 3 females rank in the top 111 of test scores with veterans' preference included, while without veterans' preference 20 females rank among the top 51).

Veterans' preference is not challenged in this suit, but its impact on the validity of scores on the written test as the sole criterion of eligibility cannot be ignored.

The City of Pittsburgh intends to follow the usual civil service procedures as set forth in the Pennsylvania Second Class City Code, 53 P.S. 23446. It intends to appoint 44 police officers in

1975. As these appointments are to be made from those who scored highest on the written examination, it is apparent that the same racially disproportionate impact will result. Of 44 appointees, only 2 will be black, and none will be female. This will neither overcome the vestiges of past discriminatory conduct nor prevent its repetition.

 We do not believe that it is either necessary or desirable to discuss the opinions that have been expressed on the cultural bias of all written examinations against certain cultural sub-groups or minorities. It is sufficient to note that cultural bias in an examination is shown when any sub-group of the population scores lower on the examination than the population as a whole. The results of the 1975 test show that, of 1659 white persons taking the test, 1509 passed; of 635 minority persons taking the test, 434 passed. The white pass ratio is 90%; the black pass ratio is 68%.

Thus, while the content of the test has been shown to be job-related, there is no evidence that a higher score on the test is any better measure of successful performance of the duties of a police officer than a lower score. It may just as well reflect a greater ease and familiarity with the technique of taking written examinations, a longer exposure to academic education, and superior schooling unrelated to the requirements of the job.

The Pittsburgh Bureau of Police has had no new appointees for over five years. On June 6, 1975, the Bureau of Police consisted of 1,431 police officers of whom 84 or 5.9% were black. On November 7, 1973, the Bureau consisted of 1,549 officers, of whom 99 or 6.4% were black.

The trend of the latest appointments from February 10, 1969 through October 26, 1970, shows that 137 officers were appointed in 1969, of whom 7 or 5% were black; 75 were appointed in 1970 of whom 2.6% were black. Of a total of the latest 212 appointments, representing 15% of the present force only 4.2%

were black, supporting the testimony that both the absolute number of blacks and their ratio of representation on the force is declining. Therefore, those blacks who presently make up the 84 members of the Bureau of Police must be concentrated among the more senior members of the force, and nearer to the permissible retirement age of 50 and 20 years of service. Therefore, the effects of past imbalance will become worse unless prompt remedial action is taken.

Because the sexual imbalance of the present police force is most striking, and because no females have been appointed for many years, there is also a pressing need to offset this imbalance at this time. The superior performance of females on the "job-related" examination at least gives us some assurance of their qualifications to serve as police officers. The percentage of females on the Pittsburgh labor market (40%) and the percentage of females scoring a passing mark on the examination (39%) indicates a large group of qualified persons who cannot be entirely excluded from appointment.

FEMALES:

On June 6, 1975, of 1,431 police officers, 12 or .8% were women, while in the labor force for the City of Pittsburgh 40% were women. Of the 2,305 persons taking the police examination in 1975, 866 or 37% were women. While 2 of the top 4 and 20 of the top 51 examinees were women, without benefit of the veteran's preference, only 1 woman ranked in the top 67 and 3 in the top 111 when veteran's preference is added. Under the contemplated system of appointment, no woman would be appointed to any of the contemplated 44 positions to be filled.

From 1952 through 1966, six examinations for the position of "patrolman" were given but no female took these examinations. However, examinations for the position of "police woman" were given in 1953, 1959 and 1964 and examinations for the position of "matron" were

given in 1952 and 1956. No males took these examinations. From 1967 through 1970, examinations for "police officer" were given in 1967, 1968 (2), 1969 and 1970. No women took these exams in 1967, 1968, 1969 and 1970.

We draw the conclusion that women believed that the police "officer" exams from 1967 through 1970, although no sex designation was given, were open only to males. That large numbers of women are actively seeking such posts is clear from the 866 who took the examination. Nevertheless, the testing system and the manner of appointment proposed to be made will effectively eliminate all women from the proposed appointments solely on what is for all practical purposes a sex-related characteristic, military service—(one-third of all male examinees passing the test received veteran's preference; less than 1% of the female applicants received it). The effect of veteran's preference applied solely among the females is great. Without veteran's preference 64 females scored 96 or above on the exam, yet with the 10 points additional for veteran's preference, 1 who scored 95 goes to the top of the list.

Because of the disparate results of the application of veteran's preference to both men and women, we believe that we commit no violence to the principle of equality of treatment, and no sacrilege against the dogma of veteran's preference by treating the male and female applicants separately with respect to this aspect of the examination results. In the application of any hiring quota the female applicants' scores, with veteran's preference included, shall be considered separately from those of the males.

CONCLUSIONS:

■ Therefore, we conclude that sole reliance upon the relative score of the applicant in the test as the criterion of appointment which results in the virtual elimination of a substantial minority group or of one sex is constitutionally impermissible.

Were a predictive validation of this test to be presented, the outcome might be different, but no predictive evaluation can be made until a sufficient number of examinees under this test have been exposed to the performance of actual police duties for a sufficient period of time to provide a statistically reliable prediction. It is obvious that this cannot be done now. Also, were composite scores to be prepared of the measurements of other qualities useful in the performance of police duties such as acuteness of vision, of hearing, physical dexterity, physical coordination, agility, height, relative weight, and stamina (with due regard being given to the recognized average differences in height, muscular and skeletal structure between male and female) we might have a much more valid standard.

■ We, therefore, paint ourselves into a corner where the available judicial remedies are limited. The ultimate responsibility for eradicating racial discrimination in the Pittsburgh Bureau of Police rests upon the officers and agents of the city. A judicial remedy can at best be palliative. A judicially imposed racial and sexual hiring quota is justified only when the City fails to take the action necessary to correct the discriminatory imbalance, and the urgency of the situation indicates the need for an early preliminary remedy.

CONCLUSIONS OF LAW:

■ Under-representation by race and sex on the Pittsburgh police force has been established by the disparity between the percentage of blacks and women on the force and their percentage in the total population and the work force. "A prima facie case is established by a demonstration that blacks were underrepresented and that there was an opportunity for racial discrimination." *Educational Equality League v. Tate*, 472 F.2d 612, 618 [3rd Cir. 1973]; *Smith v. Yeager*, 465 F.2d 272 [3rd Cir. 1972].

▇ The burden shifted to the defendants to justify their pre-hiring procedures to rebut a finding of discrimination. *Educational Equality League v. Tate*, supra, p. 616. This has been attempted by a stipulation that the written examination is job-related, and is as good a written examination as can be found. The defendants have also dropped all other pre-hiring qualifications because they might operate discriminatorily against blacks or women. However, the results of the "job-related" test not only serve to exclude blacks, but also show a very decided bias in favor of white females.

In *Erie Human Relations Commission v. Tullio*, 493 F.2d 371 [3rd Cir. 1974], the Court of Appeals rejected the argument that the adoption of a job-related written examination barred the court from imposition of a particular equitable remedy, the imposition of a hiring quota. The Court found that other pre-exam requirements had been previously employed, but were now substantially altered, thereby establishing an inference that they were not job-related, and had a discriminatory effect.

The Court of Appeals found a more compelling reason to reject this argument:

" . . . The rule they seek to establish would, in effect, limit, as a matter of law a district court's discretion in formulating equitable relief. We believe that such a per se limitation would be unwise absent a compelling demonstration of its necessity. As the Supreme Court has said:

'The framing of decrees should take place in the District rather than in the Appellate Courts. They are invested with large discretion to model their judgments to fit the exigencies of the particular case.' *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–411, 68 S.Ct. 12, 17, 92 L.Ed. 20 [1947]." 493 F.2d at p. 374.

▇ We view the exigencies of the situation as requiring the imposition of hiring quotas. Despite the valiant efforts of the city to recruit blacks and women, the effect of its selection procedure is to bar them from appointment to the police force. Reliance upon the written examination as the sole criterion for appointment, despite its validation for "job-relatedness", would not eliminate but would continue the discriminatory effect of past practices.

We well recognize the constitutional objections to remedial quotas based on race. This is often called "reverse discrimination". We believe that this epithet is not properly applied here, because we cannot accept this written test which is the sole qualification applied, as a proper single standard of qualification. It might well be applied as one of a series of qualifications, but as a sole criterion it has little effect.

Therefore, in view of the necessity of prompt action which has been urged upon us because of the urgent need of the city to fill the proposed vacancies, because of the city's commitment to certain funding agencies of state or federal government, because of high public interest in the matter, and because of "the sensitive and highly visible role played by the police in maintaining racial peace and harmony." [493 F.2d at p. 375] we have determined to require a quota as a preliminary injunctive measure for the immediate prospective appointments, and until the city can provide a better method of qualification.

▇ The use of quotas to eliminate the effects of past discrimination as well as to prevent its continuance, is judicially recognized. *Porcelli v. Titus*, 431 F.2d 1254 [3rd Cir. 1970]; *Contractor's Ass'n. v. Secretary of Labor*, 442 F.2d 159 [3rd Cir. 1971]; *Erie Human Relations Comm. v. Tullio*, supra; *Commonwealth of Pa. v. Sebastian*, infra; *Bridgeport Guardians v. Civil Service Comm.*, infra; *Carter v. Gallagher*, infra.

It is our purpose at the present time to permit the appointments to proceed on the basis of standing on the examina-

tion list, including veterans' preference, but to require that the cultural bias resulting from the use of the list be limited by requiring that rank on the list be considered separately for the racial and sexual groupings. We cannot, with the present number of vacancies to be filled, overcome the effect of past disproportion in short order, but we can make a beginning and, with the passage of time, hope to see this imbalance reduced as the older members of the force pass into retirement and the new appointees begin to fill the ranks.

We also find present here the "unique opportunity" afforded by the proposal to appoint 44 new police officers, after so extended a period of no appointments. This opportunity provides a vehicle to expedite the removal of the effects of the discrimination found here. See *Erie Human Relations Comm.* cit. supra, 493 F.2d at p. 375.

■ A district court, "sitting as a court of equity, has wide power and discretion to fashion its decree not only to prohibit present discrimination but to eradicate the effects of past discriminatory practices." *Bridgeport Guardians v. Bridgeport Civil Service Commission*, 482 F.2d 1333, 1340 [2nd Cir. 1973]. For this purpose courts have imposed hiring quotas upon public agencies, particularly in their police and fire departments. See *Bridgeport Guardians*, supra, *Carter v. Gallagher*, 452 F.2d 315 [8th Cir. 1971]; *Comm. of Pennsylvania v. O'Neill*, 473 F.2d 1029 [3rd Cir. 1973]; *Erie Human Relations v. Tullio*, 360 F.Supp. 628 [W.D.Pa.1973], *aff'd*, 493 F.2d 371 [3rd Cir. 1974]; *NAACP v. Allen*, 340 F.Supp. 703 [M.D.Ala. 1972]; *Comm. of Pennsylvania v. Sebastian*, 368 F.Supp. 854 [W.D.Pa.1972], *aff'd*, 480 F.2d 917 [3rd Cir. 1973].

We agree entirely with the rationale of Judge Teitelbaum of this court, as expressed in *Commonwealth of Pennsylvania v. Glickman*, 370 F.Supp. 724 [W.D.Pa.1974], on a greater urgency of the application of a quota system in a case involving a police force than a fire department:

"The second factor which leads the Court to distinguish *Sebastian* in terms of remedy is the fact that *Sebastian* involved a municipal police force . . . This factor . . . goes . . . to the urgency and necessity for imposing the drastic remedy of a racial hiring quota.

This second factor is based on the degree of public interaction inherent in the type of public employment under examination. In any racially integrated community, the importance of having at least some degree of minority representation on the police force cannot be underemphasized. Minority representation on the police force is vitally important both in terms of the self-esteem of minority group members, and in terms of the manner and degree of compliance accorded the police in their peace-keeping duties. It might be said that in an integrated community, the visibility of blacks on the police force is one of the keys to the maintenance of social stability." (p. 735)

■ We find that the practices and procedures used in the past and continued until the present for hiring applicants for entry level positions in the Pittsburgh Bureau of Police involve a pattern and practice of racial and sexual discrimination, whether intentional or not, which violates 42 U.S.C. §§ 1981 and 1983 and the Thirteenth and Fourteenth Amendments to the Constitution of the United States.

We further find that continued racial and sexual discrimination will result in irreparable harm to the plaintiffs and those in whose behalf this suit is brought.

We further find that the public interest requires the termination and remedying of the effect of present and past racially and sexually discriminating hiring practices.

Upon such a finding of discrimination, the court has the power and obligation to render a decree which, insofar as possible, eliminates the effects of past discriminating hiring practices as well as bars present and future discrimination. The power to render such a decree includes the discretion to impose judicially a limited preferential hiring quota to accomplish this purpose.

We find that the imposition of a temporary interim preferential hiring quota is appropriate to the circumstances of this case.

## PRELIMINARY INJUNCTION

And now, this 5th day of December, 1975, this matter having come before the court upon Plaintiffs' Motion for Preliminary Injunction and the court having considered the stipulations of the parties, and having heard testimony thereon, and in accordance with the Opinion and Findings entered this date by the court:

It is ordered that a Preliminary Injunction be, and hereby is granted plaintiffs against the defendants, their agents, servants and employees, attorneys and all persons acting in participation with them, pending the final determination of this action, and said defendants are enjoined and restrained as follows:

1. In accordance with the usual civil service procedures, the defendants shall appoint any and all new Pittsburgh Police Officers from a list comprised of all qualified applicants who have passed the written examinations administered on April 21, 1975.

2. All appointments shall be made in the order of the applicant's score on the written examination, plus any applicable veterans' preference.

3. For the purpose of determining the order of any applicant's score on the written examination, each of the following groups shall be separately listed:

White Male Applicants
White Female Applicants
Black Male Applicants (including other
Black Female Applicants racial minority
groups).

4. For as long as the present list of qualified applicants as determined by the written examination of April 1975 continues to be used, appointments from that list shall be made in groups of four containing one qualified white male, one qualified white female, one qualified black male and one qualified black female.

5. All candidates so selected for appointment shall be subject to a non-competitive medical and psychological examination before final appointment. In the event of a failure of any candidate to pass the medical and psychological examination, that candidate shall be replaced by the next ranking candidate on the eligibility list of the same race and sex as the candidate so rejected.

6. Any psychological examination to be administered to screen prospective appointees, including any background investigation, shall not be administered until it is first submitted to counsel for plaintiffs for their approval, with appropriate steps taken to ensure the confidentiality of said examination. In the event no agreement can be reached between counsel, the matter shall be submitted to the court for its approval.

7. It is further ordered that defendants shall proceed forthwith to develop a broad-based system of competitive qualifications of future applicants which measures a number of job-related qualifications and is free from the racial or sexual bias that results from the administration of a single written examination as the sole competitive criterion for appointment.

8. This interim method of appointing Pittsburgh Police Officers shall remain in effect until disposition of plaintiffs' prayer for permanent injunctive relief or until further order of this court.