COMMONWEALTH OF PENNSYLVANIA; Guardian of Greater Pittsburgh Inc.; N.A.A.C.P.; N.O.W.; et al., Plaintiffs,

v.

Peter F. FLAHERTY, Mayor, et al., Defendants,

and

F.O.P. for Fort Pitt Lodge No. 1, Intervening Defendant.

Michael C. SLATER, Plaintiff,

v.

CITY OF PITTSBURGH, a municipal corporation, Defendant.

Charles H. BOEHM; Paul G. Clark and Richard Usner, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Sophie MASLOFF, Mayor of the City of Pittsburgh; Melanie J. Smith, Director of Personnel of the City of Pittsburgh; the Pittsburgh Civil Service Commission and the City of Pittsburgh, Defendants.

Civ. A. Nos. 75–162, 90–457 and 90–629.

United States District Court,
W.D. Pennsylvania.

March 20, 1991.

Thomas Holloran, Pittsburgh, Pa., for Com. of Pa.

Robert B. Smith, Joseph F. Quinn, Mary K. Conturo, City of Pittsburgh, Law Dept., Pittsburgh, Pa., for City of Pittsburgh.

A. Bryan Campbell, Pittsburgh, Pa., for Fraternal Order of Police.

Robert L. Potter, Ronald D. Barber, Strassburger, McKenna, Gutnick & Potter, and Samuel J. Cordes, Philip A. Ignelzi, Ogg, Jones, Desimone & Ignelzi, Pittsburgh, Pa., for intervenors.

Mary P. Portis, Portis & Associates, Pittsburgh, Pa., for N.A.A.C.P.

## OPINION

COHILL, Chief Judge.

### I. INTRODUCTION

One of the constitutional dilemmas facing the federal judicial system today is the philosophical and legal conflict between the forces seeking the elimination of discrimination against females and racial minorities in the work place, and the impact that laws and legal decisions upholding minority rights have had against others seeking employment in that same work place.

For over fifteen years the City of Pittsburgh has been hiring its police officers in accordance with a strict racial/gender-based formula decreed by the late Honorable Gerald J. Weber in a preliminary injunction issued December 5, 1975.

The United States Supreme Court has recently instructed us, however, that a once-valid decree must be changed when it is found that the original purpose of the litigation has been achieved and it appears unlikely that the party enjoined will return to its former ways. *Board of Education*

*v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991).

Here we must decide whether or not the preliminary injunction issued by Judge Weber must be dissolved.

### II. BACKGROUND

Presently before the Court is the "Intervenors' Motion to Dissolve Preliminary Injunction." The Intervenors are four white males who are candidates for employment as officers of the Pittsburgh Police Department. Their motion challenges Judge Weber's long-standing order that significantly changed the way the City of Pittsburgh ("City") hires police officers.

Before this action was instituted in 1975, the City hired officers by using a procedure that relied almost exclusively upon a competitive written examination. Candidates were placed on a hiring list and ranked according to score. The City then selected those with the highest scores for further processing, which included such things as a medical examination and a background check. Those who passed the additional processing were placed on a list from which final selections were made.

After this action was initiated in 1975, Judge Weber issued a preliminary injunction under which the City would continue this same competitive hiring procedure, but which required it to hire police trainees in groups of four, one from each of four lists: white males, white females, black males, and black females. Judge Weber's ruling was never appealed, nor did any party seek to have a trial of the action on the merits. The preliminary injunction therefore remains in effect to this day. After Judge Weber's death, the case was transferred to the undersigned judge.

The Intervenors applied for positions on the City's police force and achieved high scores on the written examination, but were not hired as police officers. They assert that they were placed at an unfair competitive disadvantage by the preliminary injunction's remedial hiring quota because it allowed less qualified candidates to be hired ahead of them. They petition this

Court to dissolve the preliminary injunction on the grounds that it denies them equal protection of the law under the Fourteenth Amendment, that the law supporting the preliminary injunction has changed since 1975, that the remedial injunction has more than served its purpose, and that the quota system constitutes reverse discrimination in violation of the United States Constitution and federal law.

On August 23, 1990, in ruling on a Motion to Dismiss filed by the Commonwealth, this Court held that the Intervenors have standing to petition this Court for the dissolution of the preliminary injunction. A hearing was conducted January 28 and 29, 1991 on the merits of the Intervenors' petition. Testimony focused primarily on the adequacy of the City's hiring procedures.

Intervenors attempted to show that if the Weber injunction were vacated, the City's competitive hiring process would not violate the Constitution and would meet the standards of the federal Equal Employment Opportunity Commission ("EEOC"). They presented an expert who testified that the hiring procedures of the City had been validated in accordance with federal guidelines. Another expert, testifying for the Commonwealth, rebutted these conclusions. The testimony of other witnesses related to the attitude of the City and the police department toward the hiring of women and minorities.

Although several interested groups, including the NAACP, N.O.W. and the Fraternal Order of Police were parties to the original litigation, only counsel for the Intervenors, for the Commonwealth of Pennsylvania, and for the City actively participated in the hearing on the Intervenors' motion. The NAACP filed a post-hearing brief.

Most of the testimony at the hearing focused on test validation, suggesting a Title VII theory. In addition, a written brief filed in behalf of several of the Intervenors discussed Title VII cases at length.

"Title VII" is lawyers' short hand for Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e to 2000e–17. We see no grounds for applying Title VII to the Commonwealth's allegations of discrimination in hiring, which is the sole issue we address today. The amended complaint pleads a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, and the Constitution, but not Title VII. Amended Complaint at 8.

This case was consolidated with an apparent Title VII case alleging discrimination in training programs and promotions. *See, Pennsylvania v. Flaherty*, 532 F.Supp. 106 (W.D.Pa.1982). However, we don't believe that the consolidation of this case with a later case converts the Commonwealth's original case to a Title VII action. "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933). "Thus the courts hold that actions do not lose their separate identity because of consolidation." 9 Wright & Miller, *Federal Practice and Procedure* § 2382. Therefore we will not analyze the evidence presented according to Title VII statutes or case law. We will add parenthetically, however, that although we have not made a Title VII analysis in this Opinion, we believe that if we did, the result would be no different from that which we have enunciated here.

As we explain in the following opinion, we conclude that continuation of the injunction would be justified only if the original plaintiffs in this case could show intentional discrimination by the City. Since intentional discrimination has not been proven, we will grant the Intervenors' petition and dissolve the injunction.

## III. PRELIMINARY INJUNCTION

The Commonwealth of Pennsylvania and others initiated this action in 1975, charging that the City of Pittsburgh had violated §§ 1981 and 1983 and the Constitution by discriminating on the basis of race and gender in the hiring, appointment, promotion, and working conditions of police officers. Amended Complaint at 8. Judge Weber conducted a hearing and made factual findings regarding the City's hiring procedures. He found the percentage of blacks [1] in the Pittsburgh labor force in the following years to be:

| | |
|---|---|
| 1974 | 17% |
| 1970 | 17% |
| 1960 | 15% |

*Pennsylvania v. Flaherty,* 404 F.Supp. 1022, 1024 (W.D.Pa.1975).

He found the percentage of blacks on the Pittsburgh police force at about that time to be as follows:

| | | |
|---|---|---|
| June 6, 1975 | 5.9% | (84 out of a total of 1431) |
| November 7, 1973 | 6.4% | (99 out of a total of 1549) |

*Id.*

He found the number of blacks hired as police officers between February 10, 1969 and December 5, 1975 to be as follows:

| | | |
|---|---|---|
| February 10, 1969 | 2.3% | (1 out of 43) |
| July 28, 1969 | 4.2% | (2 out of 48) |
| September 22, 1969 | 8.7% | (4 out of 46) |
| January 12, 1970 | 5.4% | (2 out of 37) |
| October 26, 1970 | 0.0% | (0 out of 38) |

*Id.* at 1025.

Apparently, no blacks were hired between 1971 and 1975. "Thus," said Judge Weber, "of 212 new police officers added since February 10, 1969, 9, or 4.2% were black. None of these appointees were female."

Judge Weber found that the number of women, both black and white, on the police force was 12 (0.8%) out of 1,431, and that no woman had been appointed since 1966. At that time, women comprised 40% of the labor force in Pittsburgh. "Of a total of applicants to take the police examination in 1975 of 3,299, 1,176 or 35.6% were women. Of a total of 1,949 persons passing the test, 751 or 39% were women." *Id.*

Based upon the difference between the percentage of black and female police officers hired as police officers and the percentage of those groups in the population and labor force, Judge Weber found the procedures used to hire police officers "in-

---

1. We often use the term "black" in this Opinion rather than "minority," since, in a related opinion, Judge Weber stated: "minority designations other than black in the Pittsburgh Police personnel records are miniscule, and no claim of discrimination against any such person has been raised." *Pennsylvania v. Flaherty,* 482 F.Supp. 305, 307 (W.D.Pa.1980).

volve[d] a pattern and practice of racial and sexual discrimination, whether intentional or not, which violates 42 U.S.C. §§ 1981 and 1983 and the Thirteenth and Fourteenth Amendments to the Constitution of the United States." *Id.* at 1030. He concluded that "sole reliance upon the relative score of the applicant in the test as the criterion of appointment which results in the virtual elimination of a substantial minority group or of one sex is constitutionally impermissible." *Id.* at 1028. Judge Weber then entered a preliminary injunction on December 5, 1975 requiring appointments to be made "in groups of four containing one qualified white male, one qualified white female, one qualified black male and one qualified black female." *Id.* at 1031.

The Court further ordered:

that defendants shall proceed forthwith to develop a broad-based system of competitive qualifications of future applicants which measures a number of job-related qualifications and is free from the racial or sexual bias that results from the administration of a single written examination as the sole competitive criterion for appointment.

*Id.*

We emphasize that Judge Weber made no finding of intentional discrimination on the part of the City. Rather, the preliminary injunction was based upon the disparate impact the City's hiring procedure had on minorities and women.

Judge Weber labelled the quota process for selecting new police officers an "interim method," which he said would remain in effect "until disposition of plaintiffs' prayer for permanent injunctive relief or until further order of this court." *Id.*

No appeal was ever taken, nor did any party seek a final adjudication on the merits; therefore, the preliminary injunction remains in effect.

## IV. BURDEN OF PROOF

■ The parties present differing views on the overlapping issues of the burden of proof among the parties and the standard by which this Court should review the preliminary injunction issued by Judge Weber.

The City, relying on Fed.R.Civ.P. 60(b)(5) and *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) argued that the burden rests on the intervenors as the party moving to dissolve the injunction. Fed.R.Civ.P. 60(b)(5) states:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgement has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

In *Swift,* several large meat packing companies were accused of antitrust violations in the purchase of livestock and the sale of meats. In 1920, a consent decree was entered by which the meat packers agreed never to enter the grocery business. In 1930, after making various attempts in the lower courts to frustrate the operation of the decree, the packers filed a motion to modify it. The Supreme Court held that the decree could not be vacated or modified except upon a showing of "grievous wrong evoked by new and unforeseen circumstances." *Id.* at 119.

The City and Commonwealth argue that since Judge Weber has previously made a finding of discrimination after extensive fact finding, it is now up to the intervenors to show "grievous wrong evoked by new and unforeseen circumstances" to justify any modification of the injunction.

Intervenors, on the other hand, argue that *Swift* has been clarified by later Supreme Court cases. The Supreme Court addressed this issue earlier this year in the *Dowell* school desegregation opinion stating:

*United States v. United Shoe Machinery Corp.,* 391 U.S. 244 [88 S.Ct. 1496, 20 L.Ed.2d 562] (1968), explained that the language used in *Swift* must be read in

the context of the continuing danger of unlawful restraints on trade which the Court had found still existed. *"Swift* teaches ... a decree may be changed upon an appropriate showing, and it holds that it may not be changed ... if the purposes of this litigation as incorporated in the decree ... have not been fully achieved." In the present case, a finding by the District Court that the Oklahoma City School District was being operated in compliance with the command of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the school board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved. No additional showing of "grievous wrong evoked by new and unforeseen conditions" is required of the school board.

*Board of Education v. Dowell,* —— U.S. ——, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991).

It appears to this Court that the standard of review enunciated in *Swift* is inapplicable to our review of the preliminary injunction. The portion of the *Dowell* opinion quoted above makes it clear that the *Swift* standard applies only when the underlying danger justifying the prior decree continues unabated. It would beg the ultimate question presented in this case if the Court were to rule as a preliminary matter that unconstitutional discrimination against women and blacks continues unabated.

Further distinguishing *Swift* is the fact that the challenged decree here is only a *preliminary* injunction, and one that by its own terms lasts "until disposition of plaintiffs' prayer for relief or until further order of this court." 404 F.Supp. at 1031. The purpose of a preliminary injunction is to prevent irreparable harm until a trial can be held on the merits. It would be inequitable in this case to hold that the granting of the preliminary injuunction shifts to the Intervenors the ultimate burden of proof on the merits. As for Rule 60(b), this is a rule that, by its own terms, applies

only to final orders. This rule does not apply to an order granting or denying a preliminary injunction. *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 191 F.Supp. 937, 938 (D.C.N.Y.1961), *reversed on other grounds,* 308 F.2d 196 (2d Cir. 1962).

Finally, we note that the legal rationale for the preliminary injunction entered in this case was Judge Weber's finding that the City had violated the Thirteenth and Fourteenth Amendments to the Constitution. The remedial powers of the federal courts "[can] be exercised only on the basis of a violation of the law and [can] extend no farther than required by the nature and the extent of that violation." *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982). If, as the Intervenors contend, the City's hiring procedures (absent the court-imposed quota) no longer violate the Constitution, then there is no legal support for judicial intervention. It would be improper in such a case to keep the injunction in effect until "grievous wrong evoked by new and unforeseen circumstances" had been shown.

Therefore, while we accept Judge Weber's 1975 finding of unconstitutional discrimination as being arguably supported by the law as it existed at the time the injunction was entered, we find that the ultimate burden of proving unconstitutional discrimination justifying judicial intervention must remain with the plaintiffs. To justify dissolution of the preliminary injunction, Intervenors need not meet the difficult burden enunciated in *Swift,* but must merely show that the injunction is no longer valid under existing law. This can be accomplished by showing that the plaintiffs cannot meet their burden of proving intentional discrimination and that the City is unlikely to discriminate intentionally against women and blacks.

## V. FINDINGS

At the hearing held January 28 and 29, 1991, both the Commonwealth and the Intervenors offered testimony and other evidence relative to the question of whether

the City's hiring procedures would unconstitutionally discriminate against women and blacks if the preliminary injunction were vacated. To make that determination, we will here examine the City's recruitment process apart from the judicially imposed quota, the predicted impact of that process on women and minorities if the injunction were dissolved, and the justifications for its use.

## A. Hiring Procedures and Their Impact

### 1. Current Race and Gender Statistics

The parties agree that the current statistics relevant to comparing the Pittsburgh work force in general, the Pittsburgh Police Force in particular and the applicants for the police force are as follows:

| | White Male | Black Male | White Female | Black Female |
|---|---|---|---|---|
| Composition of the Pittsburgh Work Force | 39.8% | 12.7% | 34.0% | 13.5% |
| Composition of the Pittsburgh Police Department | 65.5% | 13.9% | 9.6% | 10.5% |
| Composition of Applicants for the Police Department | 45.6% | 21.6% | 19.4% | 3.4% |

### 2. Hiring Procedures

Since the Weber decree, the City of Pittsburgh selected recruits from among police officer applicants by means of a hiring procedure that has a number of steps. Plaintiffs' Exhibit 2.

The first major step is the administration of the police officer written examination. The City takes the scores of those who pass the test (by scoring 75% or more), adds an additional 10 points to the scores of those who qualify for the veterans preference and places the names of qualified candidates on eligibility lists ranked according to final effective score. In accordance with the Weber decree the City maintains four separate eligibility lists—white males, black males, white females, and black females. Pursuant to a policy known as "continuous recruitment," the names of applicants from each successive test are blended into the current eligibility lists to create new lists.

Candidates selected from the eligibility lists for further screening must successfully pass a medical examination and a drug test. Following this, candidates must take two written psychological tests—the Guilford–Zimmerman Test and the revised Minnesota Multi–Phasic Personality Inventory ("MMPI–2"). Results are reviewed with the candidate. If no obvious pathology is detected and no invalid scores are evident, the final test results are passed to a panel of psychologists who review the test results along with other background information to determine the suitability of the candidates. Candidates judged suitable by the panel must then pass a background investigation and polygraph test and be interviewed by a panel of Department of Public Safety personnel before being admitted to the police training academy.

### 3. Impact of Hiring Procedures on Minorities and Women

Pursuant to the terms of Judge Weber's preliminary injunction, as previously noted, candidates are hired in groups of four, one from each of the four eligibility lists. Michele Cunko, Assistant Director, Secretary, and Chief Examiner of the City of Pittsburgh Personnel and Civil Service Commission, and William Sullivan, Ph.D., a psychologist and private consultant hired by the City to review its written testing procedures, both testified that if the current quota hiring system were discontinued, the number of white males hired as police officers would increase, while the number of

blacks and women hired would decrease significantly.

Several reasons were given for this prediction. While there are many steps in the hiring process, the written examination score is by far the most important factor in determining who gets hired. The other steps are simply screening devices designed to detect the occasional candidate who may be unsuitable for some reason. White males as a group consistently achieve the highest scores among the four race and gender groups, followed in order by white females, black males, and black females. Testimony of Michele Cunko. In addition, white males comprise nearly half of the applicants to the police force. Thus, if the four hiring lists were merged and all candidates were ranked according to examination score, white males would dominate the top of the list by virtue of scores and sheer numbers. The only reason offered by any of the witnesses for the white males' advantage in test score and numbers of applicants was Dr. Sullivan's suggestion that white males are more "culturally attuned" to work as police officers.

The major reason that women would be at a disadvantage if the lists were merged is that male candidates have consistently been more likely than female candidates to receive veterans preference points. Since the number of applicants to the police force far exceeds the number hired each year, and continuous recruitment continually places more and more high-scoring candidates at the top of the list, only those with particularly high scores would be selected from a merged list.

Even a woman who achieved a perfect score of 100 on the exam would rank under a man who scored 91 and had 10 veterans preference points added. On the current eligibility lists, 126 white males and 43 black males show scores higher than 100. By contrast, only 10 women (black and white combined) have scores over 100 on the current eligibility lists. Ms. Cunko testified that in the absence of the current quota system, it would be "cruel" to encourage women to apply for jobs on the force since so few would be hired.

Thus, there is no doubt that should the injunction be dissolved, it will have an advance impact on the hiring of blacks and women.

### 4. Recruitment

The City has taken steps to cure the disparity in the number of applicants from various groups with an aggressive recruitment program. The parties to this action made the following stipulations:

> From 1975 until the present, the City of Pittsburgh, its Civil Service Commission and Department of Public Safety have undertaken an intensive recruitment campaign to encourage blacks and women to apply for a position as police officer.

. . . . .

> From 1975 until the present, the City of Pittsburgh, its Civil Service Commission and Department of Public Safety, have taken all reasonable and appropriate steps to advertise the administration of the written examination for police officer in communities, organizations and publications calculated to attract applicants from all racial and gender groups, including specifically black and female applicants.

> If the Preliminary Injunction in this case were no longer in force and effect, the City of Pittsburgh, its Civil Service Commission and Department of Public Safety, would take all reasonable and appropriate steps to recruit applicants for the position of police officer from all racial and gender groups, including specifically black and female applicants.

. . . . .

Second Set of Stipulations.

The City's recruitment efforts toward women and minorities have taken the form of targeted mailings, fliers, and advertisements in the electronic media featuring well known sports figures, particularly black athletes. Testimony of Michele Cunko.

5. *Other Testimony Relevant to Discrimination*

The Commonwealth presented testimony designed to show that even with the Weber injunction in place, there has been discriminatory treatment against minorities and women in the police department. Gwendolyn Elliot, a black woman who is a commander in the police department, testified that she believes women and blacks are not promoted as readily as are white males. Commander Elliot testified that no blacks have been trained in hostage negotiation; only one black is assigned to the crime unit, and only two black males are assigned to the homicide department. She stated that, to her knowledge, women who have applied to the homicide department in recent years have had qualifications comparable to the men who were hired.

Alma Fox, a member of the Pittsburgh Human Relations Commission, testified that in 1987 the Commission became "concerned" about the hiring of police officers. She said the Commission studied the matter and issued a report in 1988 that recommended changes in the hiring process. These proposed changes included involving more minorities and women among those who evaluate psychological screenings, reexamining the police officer "profile" against which psychological tests are evaluated, revising the way credit background information is used to disqualify candidates, and reconsidering or revising the use of polygraph tests. Plaintiff's Exhibit 11. The report also noted that progress had been made in a number of the areas in which change was recommended. *Id.*

The Commission's report stated that the City's process for recruiting and hiring women and minorities "lacks credibility with much of the public, elected officials, and indeed candidates." *Id.* But the report went on to note that "[t]his is not to say all criticisms are valid or based upon an adequate understanding." *Id.*

Neither the testimony of Commander Elliot nor that of Ms. Fox presented any compelling indication that the department intentionally discriminates in *hiring* on the basis of race or sex. The testimony of Commander Elliot focused on alleged discrimination in promotion and assignment, not in hiring, and that is not in issue here. But to the extent that it bears on the City's attitude toward blacks, we nevertheless find that this testimony failed to show conclusively that women and minorities are routinely denied promotions or choice assignment and that illegal discrimination is more likely than not the basis for such denials.

The report of the Pittsburgh Human Relations Commission raised a number of issues concerning minorities and women, but there was no indication that the City was using any step in the hiring process as a means of purposeful discrimination. In fact, the Report noted that the City had made progress in some of the areas of concern, and there was no evidence of illegal discrimination in any particular case.

We note that in the earlier years of the preliminary injunction's operation, Judge Weber addressed the issue of promotion of women and minorities and entered appropriate remedial orders. 477 F.Supp. 1263 (W.D.Pa.1979); 532 F.Supp. 106 (W.D.Pa. 1982). As Judge Weber did, we view the preliminary injunction as separate from the issue of promotions. Thus, our Opinion today has no effect on these earlier orders. Likewise, we view these findings of discrimination in promotion as unrelated to our consideration of the preliminary injunction.

6. *Conclusion*

We find that if the preliminary injunction is dissolved, the most likely result will be that most police officers hired will be white males, a few more will be black males, and very few will be women. While there was some testimony that the police department fails to give black women substantial assignments, we find no hard evidence of discrimination in the department or in the City administration. In fact, the two city administrators who testified, Ms. Cunko and Glenn Cannon, Director of the Department of Public Safety, impressed us as having sincere concern about the problem of attracting minority and female candi-

dates. We accept their statements that the efforts to recruit such candidates would continue even if the injunction were dissolved.

There are several reasons for the anticipated disparities in hiring in the absence of the quota system. The primary reason is that whites and males tend to score higher on the entry examination than do minorities and females. In addition, white males make up the largest segment of the applicant pool, and males in general are more likely to receive veterans preference points. Since the written examination is by far the most important differentiating factor in the hiring process, we now turn to an examination of whether the City's hiring procedures comprise a legitimate and legally defensible method for hiring police officers.

## B. *Justification of Hiring Procedures*

The question of the hiring procedure's relationship to legitimate recruitment bears on the issue of intentional discrimination. For that reason, we will examine the testimony regarding test validation in some detail. We emphasize at the outset, however, that our purpose in assessing the sufficiency of the validation studies is not to decide whether they meet the standards of the EEOC but simply to determine whether the City's attempts to validate the hiring procedure were so inadequate as to support an inference of intentional discrimination.

Michele Cunko, the City official responsible for administering the written civil service examination, testified that the examination tests skills in four main areas: memory and observation, reading comprehension, communication skills, and interpretation of written material. She explained that memory, observation, and communication skills are important because officers need to make observations while on patrol, communicate with members of the public, write accurate reports, and testify accurately in court. An officer must have good reading comprehension and interpretation skills in order to understand and apply state and local laws and police department policies.

Ms. Cunko testified that the City also requires medical and psychological examinations because physical and psychological fitness are essential to the performance of a police officer's duties. The psychological examinations test such areas as initiative, community interaction, acceptance of authority, ability to maintain working relationships with others, and reliability and dependability on the job. Deficiencies in any of these areas could indicate that a candidate will have trouble meeting the demands of the job. Other screening devices such as a drug and polygraph test, background check, and staff interviews also help to identify candidates who may be unsuitable for some reason.

Following the imposition of the Weber injunction in this case, the City hired a private consulting firm to perform validation studies on the written tests employed by the City. A validation study attempts to determine whether the test accurately assesses the skills and aptitudes needed for the particular job. William Sullivan, Ph.D., a psychologist and Director of Research at PSP Human Resources Development ("PSP"), testified that PSP was asked to design an appropriate police officer written examination in 1975.

PSP worked in conjunction with the police department to develop an analysis of the skills needed for police officers on the job. Intervenors Exhibit 1. The job analysis lists numerous duties that police officers must perform. For each duty listed, the analysis contains an evaluation of the level of difficulty, the frequency and conditions under which it must be performed, the degree to which the duty is critical, and the knowledge, skills and abilities needed for successful performance. *Id.* For example, the analysis lists "accident investigation" as a frequent, very critical duty. This duty can range from "routine to difficult," and must be performed under conditions ranging from "a calm fender-bender accident to stress and excitement where death or injury may be involved." *Id.* at 8. The knowledge, skills and abilities needed to perform this duty are evaluated as follows:

> Candidate must be able to observe details, however minute, and be able to

reduce the observation into a clear concise report. Must be able to absorb a working knowledge of the Vehicle Code and be able to recognize violations. The officer must also have the emotional stability to remain calm under adverse conditions and be able to make a sound judgment in order to start the flow of traffic as soon as possible. Must be able to learn first aid needed in order to render aid to the injured. The officer must also be able to communicate with people, have good understanding of the English language and be able to spell and read. *Id.*

Next, PSP consulted with officials in other cities to identify appropriate testing practices. On the basis of this research, PSP developed an examination based on a test developed by the International Personnel Management Association ("IPMA"). Dr. Sullivan explained that the resulting examination uses IPMA model questions that have general applicability, but tailors others to include laws in effect in Pittsburgh.

In 1977, PSP completed a validation study on the 1975 written examination and reported:

> The scores of 35 new Pittsburgh police recruits on the 1975 Police Officer Examination were compared with their grades at the Police Training Academy. The correlation between the 1975 Police test scores and Training Academy grades was *.69* corrected for restriction of range.
>
> The correlation coefficient of .69 is an index representing a very strong relationship between the test score and grades. This correlation far exceeds the .05 level of significance that serves as a standard in both the professional literature and EEO regulations for demonstrating the validity of a selection device.
>
> As far as I know the correlation we found (.69) is higher than any other reported in the literature....

Intervenors' Exhibit 12.

PSP concluded that the written examination "seems to be a strong, valid, defensible selection test that should continue to be of considerable help to the City of Pittsburgh in selecting qualified, trainable, successful police officers." *Id.*

At the hearing Dr. Sullivan testified in some detail about the validation studies that he and PSP had conducted regarding these tests. A study in 1983 concluded that the examinations "are capable of providing very powerful prediction of both performance on the job and regularity of attendance." Intervenors' Exhibit 13.

A more in-depth validation study was conducted in 1988 and reached the same conclusion. Intervenors' Exhibit 14, page 4.

Intervenors submitted six documents recording adverse impact calculations for the police officer written examination. These documents compare the pass rates of whites with those of minorities, and of men with those of women. According to federal regulations:

> A selection rate for any race, sex or ethnic group which is less than four-fifths ($\frac{4}{5}$) (or eighty percent) of the rate of the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact....

29 C.F.R. § 1607.4(D).

For example, if 100% of all whites taking a particular test achieved passing grades, and 85% of all blacks taking the same test achieved passing grades, no adverse impact upon blacks would be identified under EEOC guidelines because the number of blacks passing the test was more than 80% of the number of whites. If 100% of all whites passed and only 75% of all blacks passed, then that would demonstrate adverse impact upon blacks.

Of the six examinations administered between May of 1987 and February of 1990, none showed any adverse impact upon minorities or women. Pass rates were as follows:

| Date of Test | Whites | Minorities | Males | Females |
|---|---|---|---|---|
| 2–90 | 96.6% | 81.8% | 91.3% | 88.3% |
| 7–27–89 | 90.8% | 78.5% | 87.0% | 82.3% |
| 5–24–89 | 92.1% | 82.6% | 90.2% | 81.8% |
| 3–2–89 | 94.7% | 79.7% | 90.4% | 83.9% |
| 7–23–88 | 92.6% | 75.0% | 88.2% | 81.7% |
| 5–87 | 92.7% | 75.0% | 84.9% | 83.2% |

Intervenors' Exhibits 2–5, 7 and 8.

A comparison of whites against minorities and men against women showed that the numbers of minorities and women passing the test were never less than 80% of the numbers of whites and men passing the test.

In response to the Intervenors' evidence justifying the written entry examination, the Commonwealth submitted the testimony of its own expert witness, Anthony Nitko, Ph.D, Professor of Education at the University of Pittsburgh. Like Dr. Sullivan, Dr. Nitko has extensive training and experience in statistics, testing, and psychology. Plaintiff's Exhibit 1. According to Dr. Nitko, the validation study performed by PSP was inadequate to show that the written and psychological examinations are sufficient predictors of police officer performance.

Dr. Nitko explained that to validate a test under professional standards, the skills tested must be specifically linked to specific performance skills needed on the job. He found, for instance, that while the police officer written examination adequately measured reading and memory, it did not measure other skills identified by the police officer job analysis as essential to an officer's performance, such as the ability to communicate in writing. PSP had compared examination scores with performance at the police academy, but not with performance on the job. Moreover, the City no longer trains recruits at its own police academy, but instead sends them to a Pennsylvania state training program. Finally, Dr. Nitko testified that since the written examination is only one part of the selection process, there should be some validation of its impact on the overall hiring scheme. For these reasons, Dr. Nitko opined that there was insufficient evidence to conclude, according to proper psychometric standards, that the written examination is a valid measure of future police performance.

Dr. Nitko testified that the psychological examinations were not properly validated, either. He believed that the 1983 PSP report was based on incomplete data and lacked proper linkage between test results and performance criteria. He testified that the 1988 report, while better than the first, was still incomplete. For one thing, only 243 of the 400 evaluation forms given out were returned, and the report failed to account for possible resulting bias. Dr. Nitko criticized the second report's singular reliance upon supervisor evaluations since such evaluations are "not always" the best measure of performance. He argued that some of the links between traits measured on the examinations and performance on the job were weak. Finally, he testified that there was no measurement of error in either of the two studies. Thus, Dr. Nitko believed that the reports lacked sufficient evidence to conclude that the psychological examinations were validated.

Dr. Nitko also suggested that the City's adverse impact calculations are insufficient to detect any meaningful impact upon race or gender. The main reason for this conclusion is that because of the continuous recruitment process, the minimum score one has to achieve to have a reasonable chance of being hired has been raised far above the passing score of 75. Therefore, a comparison between the percentage of groups "passing" the examination tells very little about the impact the examination actually has on these various groups.

An analysis of those achieving higher test scores illustrates this point. The following chart shows the percentage of each group scoring at or above selected levels on the written examination on five successive tests administered in 1988 and 1989:

| Test Score | Black Females | Black Males | White Females | White Males |
|---|---|---|---|---|
| 95% | 1.6% | 1.1% | 4.9% | 6.3% |
| 90% | 10.0% | 11.6% | 23.2% | 30.4% |

Plaintiff's Exhibit 4.

---

Applying the 80% test (See page 482) to the figures in this chart produces results quite different from those produced when comparing the numbers of the various groups passing with scores of 75% or more. In May of 1990, this Court denied standing to intervene in this case to a candidate with a score of 94 because we found that someone with his score would not have a realistic chance of being hired if all the lists were merged. Memorandum Order (W.D.Pa. May 25, 1990), *affirmed*, slip op. (3d Cir. Dec. 13, 1990). In light of this finding, the Commonwealth argued, it appears that an adverse impact analysis of scores at the 90–95% range are much more probative than an analysis of scores at the 75% range.

## VI. DISCUSSION

In light of all of this evidence, this Court must now decide what course of action is most appropriate under current law. Since we are asked to dissolve an injunction mandating remedial hiring measures, the most useful analysis will be to evaluate the constitutionality of the City's hiring procedures in the absence of the remedial Order. Stated another way, the question is whether the City's hiring method, standing alone, is unconstitutionally discriminatory, thereby justifying continued court intervention.

### A. *Sex Discrimination*

 Deciding whether the City's hiring procedures unconstitutionally discriminate on the basis of gender requires little discussion. It is clear that sex discrimination in employment is not cognizable under § 1981. *DeGraffenreid v. General Motors Assembly Div.*, 558 F.2d 480, 486, n. 2 (8th Cir.1977); *Croker v. Boeing Co.*, 662 F.2d 975, 1000 (3d Cir.1981) (Aldisert, J., concurring and dissenting); *Montano v. Amstar Corp.*, 502 F.Supp. 295, 297 (E.D.Pa.1980). While Title VII addresses sex discrimination in employment, this action was not brought under that statute.

But even if sex discrimination were cognizable under § 1981, there has been a significant change in the law since 1975 when Judge Weber issued the injunction. The disparate impact of the City's hiring practices upon women derives in large part from the application of veterans preferences. This was as true at the time of Judge Weber's injunction as it is today, and appears to have been the basis for his establishment of quotas favoring women. His Opinion stated:

Because of the disparate results of the application of veteran's preference to both men and women, we believe that we commit no violence to the principle of equality of treatment, and no sacrilege against the dogma of veteran's preference by treating the male and female applicants separately with respect to this aspect of the examination results. In the application of any hiring quota the female applicants' scores, with veteran's preference included, shall be considered separately from those of the males.

404 F.Supp at 1028.

Several years after Judge Weber imposed this injunction, the Supreme Court ruled in a case based upon 42 U.S.C. § 1983 that laws operating to the advantage of males by giving veterans preferences for public employment are not violative of equal protection. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). The Weber

injunction now, therefore, impermissibly interferes with the operation of a valid veterans preference law according to *Feeney*.

### B. *Racial Discrimination*

 We are left, then, with the claim of racial discrimination under § 1981. We start with an examination of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), a case brought under 42 U.S.C. § 1981 alleging that the District of Columbia's police hiring procedures, including the use of a written examination, were racially discriminatory. At issue in *Davis* was the use of "Test 21," a civil service examination " 'designed to test verbal ability, vocabulary, reading and comprehension.' " 426 U.S. at 235, 96 S.Ct. at 2045 (quoting 348 F.Supp. 15, 16 (D.C. 1972)). The District Court found that " '(a) The number of black police officers, while substantial, is not proportionate to the population mix of the city. (b) A higher percentage of blacks fail the Test than whites. (c) The Test has not been validated to establish its reliability for measuring subsequent job performance.' " *Id.* The District Court did find, though, that the test had a "direct relationship to recruiting." 426 U.S. at 236, 96 S.Ct. at 2045–46 (quoting 348 F.Supp. at 17). No evidence indicated that the police department intentionally discriminated against blacks. Indeed, the District court found that the department had "systematically and affirmatively sought to enroll black officers...." 426 U.S. at 235, 96 S.Ct. at 2045.

The Court of Appeals ruled that the test's disproportionate impact on blacks constituted a Fifth Amendment violation, despite the lack of discriminatory intent. 512 F.2d 956 (D.C.Cir.1975). The Supreme Court reversed, ruling that the statutory disproportionate impact standard enunciated in *Griggs v. Duke·Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a Title VII case, did not apply to an Equal Protection issue:

> [W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule ... that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.

426 U.S. at 242, 96 S.Ct. at 2049 (citation omitted).

Much of the testimony at the hearing in this case centered on the goals of the hiring process, the sufficiency of the written examination and other hiring procedures in meeting the stated goals, and attempts by the City to validate these procedures. *Davis* makes it clear that in a case based on the Constitution unlawful discrimination can only be established by showing an actual intent to discriminate. Unlike a Title VII case, proof of discrimination cannot rest solely on a showing of disparate impact plus an absence of valid job-relatedness in hiring procedures. *See, Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). However, these factors are nevertheless probative on the issue of intent. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242, 96 S.Ct. at 2048–49. *See also, Richardson v. Pennsylvania Dep't of Health*, 561 F.2d 489, 491–92 (3d Cir.1977).

As our previous section indicates, there is no doubt that the City's hiring procedures would have a disparate impact on blacks absent the Weber injunction. But there is no direct evidence that the City *intentionally* uses the hiring process as a device for racial discrimination. To the contrary, City administrators who testified at the hearing described affirmative steps to recruit minorities and obviously are sensitive to the problem. The parties have stipulated that the City has pursued such a policy since 1975 and will continue to do so even if the injunction is vacated. Thus, the

only possible basis for a finding of intentional discrimination in the instant case would be a showing that the hiring procedures are so inadequate as to be a sham, thereby raising the inference that its use is merely a cover for purposeful discrimination. An examination of the City's hiring procedures and its efforts to validate those procedures reveals no basis for such an inference.

The City's written examination, at the very least, effectively assesses a candidate's reading comprehension, memory, observation, and ability to interpret written material. A candidate needs these skills to achieve success during police officer training, to learn the department's policies, and to carry out many of the duties officers are called upon to perform. The City hired PSP, which specializes in psychology and testing to design a valid, non-discriminatory examination. PSP reported that the test "seems to be a strong, valid, defensible selection test that should continue to be of considerable help to the City of Pittsburgh in selecting qualified, trainable, successful police officers." Intervenors Exhibit 12.

The Commonwealth argues that the methods used by PSP to validate this examination were insufficient. Dr. Nitko presented a persuasive case that the validation study fell short of being a thoroughly airtight justification of the test's validity under professional standards. But the crucial question here is not the degree of statistical accuracy of the validation study, but the intent of City officials. No evidence indicates that any City official had any reason to think that the validation study did not meet professional standards, in other words that it was a sham. We should also note that until this petition was filed by the Intervenors, the Commonwealth never criticized nor sought to "test" the test.

We find on the evidence presented that the written examination is a reasonable measure of skills needed for success as a police officer. More importantly, we find that the City took reasonable steps to ensure that the test effectively measured those skills, and believed that it did. Thus,

we can draw no inference of intentional discrimination in the administration of the written examination.

The same reasoning applies to the City's use of psychological examinations. No one disputes that properly used psychological examinations help to screen out candidates whose temperament or personality may be incompatible with the critical and demanding work of a police officer. Although the results of these tests apparently require subjective interpretation along with a personal interview, no evidence was presented that the tests are used to reject candidates on racial gender grounds. There has been no allegation that the psychological tests have a greater impact upon minorities than on whites.

Dr. Nitko again criticized PSP's validation process as inadequate under professional psychometric standards. He testified that some studies have found the MMPI (Minnesota Multi–Phasic Personality Inventory) "inadequate" in predicting police and firefighter performance. Yet he indicated that, in general, proper use of the Guilford–Zimmerman test (also utilized by the City) has some utility in the hiring process and agreed that some experts describe it as an "excellent indicator." He conceded that the recent revision of the MMPI ("MMPI–2") was intended to reduce cultural and racial bias, although he said it was too early to determine the MMPI–2's effectiveness.

The evidence fails to establish that the psychological examinations are not useful and reasonable steps in the police hiring process, or that they have any racially discriminatory impact. Once again, City officials took reasonable steps to make sure that these tests were valid, and there is no evidence to indicate that they had any reason to doubt the validation studies' effectiveness.

Finally, Dr. Nitko suggested at the hearing that the City should have performed some sort of validation studies on all the other steps in the hiring process. However, it does not appear that the other steps are easily given to statistical validation. Experts can compare written test scores

with on-the-job performance ratings to determine the degree of correlation between the two. But other steps in the process, like a drug test or a background check for previous convictions, yield a "yes or no" result. One cannot compare the performance of officers who passed the drug test with those who failed it because those who test positive for illegal drug use are never hired. No one suggests that drug users should be hired as police officers. Therefore, we find no dereliction of duty and no bad faith on the part of the City in not performing validation studies on hiring procedures other than the written examination and psychological screenings.

In sum, we find no evidence—direct or indirect—of intentional racial discrimination on the part of the City in the hiring of police officers. We therefore find no basis under § 1981 to support continuation of the injunction.

Our finding that the City lacked the intent to discriminate on racial grounds is consistent with prior case law. In *Guardians Ass'n v. Civil Serv. Comm'n*, 431 F.Supp. 526 (S.D.N.Y.1977), *rev'd in part on other grounds*, 633 F.2d 232 (2d Cir. 1980), the court found no intentional discrimination in the hiring of New York City police officers, even in the face of stronger evidence than we have here. In *Guardians Ass'n*, as here, the City used an entry examination that was facially neutral but had the effect of screening out minority candidates. *Id.* at 543. In addition, there was evidence that the City was lackadaisical in starting efforts to recruit minorities, and only began affirmative minority recruitment after a hiring freeze went into effect. *Id.* at 535. As to the entry examination, the court ruled that "[a]bsent a showing that the entry level examinations were purposely designed to keep minorities out of the police force, *Washington v. Davis* required that such procedures be sustained even if they have the result of screening out minorities." *Id.* at 534. The court then found that the evidence of insufficient recruiting efforts failed to establish liability under the Constitution or § 1981. *Id.* at 535.

A finding of intentional discrimination in hiring under the principles announced in *Davis* requires much more evidence than we have here. In *Arnold v. Ray*, 21 F.E.P. 793 (N.D.Ohio 1979), the court used evidence of a disparity between the percentage of blacks on the police force (7.1%) and the percentage of blacks living in the City of Akron (17.5%) as only one factor in its conclusion that the City had intentionally discriminated against blacks in the hiring of police officers. "Other factors of prime importance are that the written examination used up until 1974 had a known adverse impact on black applicants, and that the background investigation employed in the past was a highly subjective procedure that was a natural vehicle by which to disguise intentional discrimination." *Id.* at 794. The court also found that the City had delayed implementing a minority recruitment program and later abandoned it altogether until the time of trial. *Id.* at 795. Finally, the mayor had testified that he believed the two main problems in recruiting blacks were the "negativism" of black leaders and the fact that blacks did not want to be policemen. *Id.* The court in *Arnold* found that these circumstances, taken together, supported a finding of intentional discrimination justifying the imposition of remedies. The evidence in this case shows nothing more than disparate impact, far short of the quantum of evidence supporting the finding in *Arnold*.

Our conclusion that mandatory hiring quotas are not appropriate on these facts finds additional support in *Dawson v. Pastrick*, 600 F.2d 70 (7th Cir.1979). In *Dawson*, the Court of Appeals upheld the District Court's denial of a request to impose hiring quotas upon the East Chicago, Indiana Fire Department. Plaintiffs in that case argued that the City had discriminated against minorities in the hiring of firefighters, and that promotion procedures in effect at the time of trial "reinforced and continued the discrimination by 'locking in' the effects of the department's past practices." *Id.* at 72. The lower court (441 F.Supp. 133 (N.D.Ind.1977)) held that while disparities between the racial composition of the fire department and that of East

Chicago established a *prima facie* case under § 1981[2], the plaintiffs had failed to establish intentional discrimination under *Washington v. Davis.* The lower court held, and the Court of Appeals agreed, that the appropriate remedy was to order the City to conduct affirmative recruitment of minorities and to validate all application and examination procedures under EEOC guidelines. 600 F.2d at 73. In this case, the City of Pittsburgh has undertaken substantial efforts to recruit minorities for the past 16 years and has conducted validation studies of its hiring procedures. As in *Dawson,* there is insufficient evidence of purposeful discrimination to justify mandatory hiring quotas.

## VII. CONCLUSION

Federal courts may intervene to require remedial measures such as hiring quotas only when intentional discrimination has been proven. After reviewing the evidence in this case, we find that the hiring system established by the City is designed to attract the best candidates without regard to gender or skin color. There is no evidence that the City has intentionally discriminated in the past, or is likely to do so in the future.

The Commonwealth has presented a persuasive case that reliance on examination scores as the primary factor in hiring will favor whites and males over minorities and females, and that the City should undertake further investigation to ensure that the entire hiring process is fair, unbiased, and fulfills the City's legitimate affirmative action goals. But the Commonwealth's case falls short of the clear evidence of intentional discrimination that would justify continuing judicial intervention. Therefore, there is no constitutional basis for this Court to continue requiring hiring quotas based upon race and gender.

This does not mean that the City cannot, or should not, continue to make every effort to recruit qualified women and minorities for positions on the police force. Even without the quota previously imposed by this Court, the City is nevertheless free to pursue, and we expect that it will pursue, an affirmative action strategy that is appropriate and in accord with applicable law. Testimony presented at the hearing established that public-interest groups have taken an interest in the City's hiring procedures and have exercised their influence to try to persuade the City to make greater efforts to hire and promote qualified women and minorities. We hope these efforts will continue.

The City will no doubt continue to use testing procedures that fulfill its goal of attracting the most qualified applicants to the police force. At the same time, we would hope that considerations of community interest and simple fairness will motivate the City to ameliorate the adverse effects of the test scores on women and minorities with appropriate, legally justifiable affirmative action measures. However, this Court finds that under current law it is no longer compelled to place a rigid quota hiring system upon the City. The preliminary injunction entered December 5, 1975 must therefore be dissolved.

As noted, the plaintiffs have not established the standard of intentional discrimination necessary to sustain the continued imposition of the court injunction.

We are well aware that dissolution of the injunction may have a negative impact on the employment by the City of women and minorities for its police force. The selection process, however, must be competence-based and fairly administered. We believe that this Opinion reflects the current law on the subject.

---

**2.** The district court ruled that "[t]he claim under 42 U.S.C. § 1981 is a statutory claim and the burden of proving intentional or purposeful discrimination required under a constitutional claim is not required." 441 F.Supp. at 140. Because the defendants did not appeal the trial court's judgment, the Court of Appeals in *Dawson* found no need to decide "the difficult issue raised about the elements of 1981." 600 F.2d at 77, n. 10. Most appellate courts addressing this issue, including the Third Circuit Court of Appeals, have ruled that § 1981 claims require a showing of intentional discrimination. *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 121 (3d Cir.1985); *Croker v. Boeing Co.,* 662 F.2d 975, 985 (3d Cir.1981).

We trust that the City is sensitive to the need to continue review and refinement of recruitment, testing and evaluation procedures.

The plaintiffs have addressed valid concerns. The City must be vigilant in addressing those concerns. Should intentional discrimination by the City be alleged at some time in the future, this Court will not hesitate to give such allegations a full and complete hearing, and, if necessary, order appropriate remedial measures.

An appropriate Order will issue.

## ORDER

AND NOW, to-wit, this 20th day of March, 1991, for the reasons described in the foregoing Opinion, it is ORDERED, ADJUDGED and DECREED that this Court's preliminary injunction, entered December 5, 1975, be and hereby is VACATED and DISSOLVED.